Terri M. SANFILLIPPO, Personal Representative of the Estate of John J. Sanfillippo, Deceased, Plaintiff/Respondent,

v.

Kurt OEHLER, D.D.S.,
Defendant/Appellant.

No. 64271.

Missouri Court of Appeals,
Eastern District,
Division One.

Nov. 23, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 29, 1993.

Application to Transfer Denied
Feb. 22, 1994.

Thomas Cicardi DeVoto, Wuestling, James & DeVoto, St. Louis, for defendant, appellant.

Mark David Sadow, Raskas, Ruthmeyer, Pomerantz & Wynne, St. Louis, for plaintiff, respondent.

REINHARD, Judge.

Defendant appeals a judgment of the trial court in favor of plaintiff, as Personal Representative of the Estate of John J. Sanfillippo, ordering defendant to pay the estate $50,-660.25, and $1,585.82 per month for ninety-four months thereafter, pursuant to a non-competition agreement entered into between defendant and John Sanfillippo. We affirm.

The parties submitted this case to the trial court on an agreed statement of facts. On December 7, 1990, John Sanfillippo, the president and sole stockholder of the professional corporation "John J. Sanfillippo, D.D.S., P.C.", entered into an "Asset Purchase Agreement" with defendant. That agreement required defendant to pay Sanfillippo $60,000 in exchange for the corporate assets of the professional corporation. The "Asset Sale Agreement" was conditioned on the execution of an "Employment and Non–Competition Agreement" (hereinafter referred to as the Agreement), which was also executed on December 7, 1990.

The employment portion of the Agreement provided that Sanfillippo would provide his dental services to the professional corporation for no more than two and one-half days per week (subject to being increased by mutual agreement of the parties) for a three year period. In the two succeeding years, Sanfillippo was to provide dental services for no more than two days per week. Dr. Sanfillippo would be paid an amount equal to 40% of the collected receipts generated by the work he performed. Dr. Sanfillippo also agreed to assist defendant in the retention of former patients. *The employment agreement was terminable by either defendant or Sanfillippo upon ninety days notice. However, termination of the employment agreement, by either party, would not relieve defendant of his obligations under the non-competition agreement.*[1]

The non-competition agreement provided that Dr. Sanfillippo would not:

> directly or indirectly practice dentistry or take an ownership interest in a dental practice in any fixed location within a radius of fifteen (15) miles from the premises. Further, during the term of this Agreement and for three years thereafter, Sanfillippo will not, from any location, solicit any of the current patients of the practice or patients treated by Sanfillippo at the offices of Oehler.... Provided further, that for an additional two (2) year period, Sanfillippo will not practice dentistry from a fixed location within ½ mile from the premises.

The agreement further provided:

> As compensation for Sanfillippo's agreement not to compete, Oehler shall pay to

---

1. The stipulation stated "[t]he parties agree that Oehler has paid the estate in full for the Employ- ment compensation."

Sanfillippo the sum of $120,000.00 payable in equal monthly installments, commencing thirty (30) days after closing and payable thereafter on the 30th day of each month and continuing for an additional one hundred nineteen (119) months thereafter with interest in [sic] the unpaid balance at 10 percent which amount is $1,585.82 per month.

Defendant had the right to prepay the unpaid principal balance at any time. He also agreed to cooperate with Sanfillippo in the purchase, at Sanfillippo's expense, of a life insurance policy to secure payment on the non-competition agreement.

Dr. Sanfillippo died on or about January 15, 1991. Defendant had made one payment on his obligation under the non-competition agreement, but made no others after the death of Dr. Sanfillippo. Terri Sanfillippo, personal representative of decedent's estate, brought this action on behalf of the estate, for payments due. Defendant argued that he was excused from further payments because the Agreement was one for personal services which terminated upon Dr. Sanfillippo's death. The trial court found that the non-competition portion of the Agreement was not one for personal services, and therefore, did not terminate upon Dr. Sanfillippo's death.[2] It entered judgment in favor of Dr. Sanfillippo's estate.

In his sole point on appeal, defendant states:

The trial court erred in both its findings of fact, declaration of law, and its application of the law in that it concluded that this contract was a "pure" covenant not to compete and not a contract that called for other personal services and that, therefore, it did not terminate upon the death of the covenantor. The court further erred when it concluded that a covenant not to compete is not a personal service contract. The appellate courts of this state have already declared that such contracts are personal service contracts which terminate

upon the death of the covenantor in the absence of very specific language in the contract whereby the parties very specifically waive termination upon death of the covenantor.

At the outset, we note that the parties dispute the nature of the Agreement. Defendant contends that the Agreement is a single contract providing "for two specific types of compensation...." Plaintiff contends that the Agreement is "by [its] terms, two separate contracts within one document, ...."

■ Severable or divisible contracts are, in legal effect, independent agreements about different subjects, though made at the same time. *Swinney v. Continental Building Co.*, 102 S.W.2d 111, 120, 340 Mo. 611 (1937). The question is primarily a question of the intent of the parties determined from the language used and the subject matter of the agreement. *Swinney*, 102 S.W.2d at 111.

■ A contract is entire if a party's duty to perform each of his promises is dependent upon the other party's performance of each of his. *Fischer v. National Indus. Services*, 735 S.W.2d 114, 116 (Mo.App.1987). If a contract embraces distinct promises that admit to separate execution, the contract is divisible. *Id.*

■ In the instant case, it is clear that the employment agreement and the non-competition agreement are independent. Each is supported by separate consideration, the employment contract could be terminated upon ninety days notice of either party, and the termination by either party would not relieve defendant from his payment obligations under the non-competition agreement.[3]

As the agreements are independent and severable, we turn to the issue of whether the non-competition agreement, entered into within the context of the sale of a business' assets, is one for personal services.

■ A personal services contract is one "resting on the skills, tastes, or science of a party, that is, those contracts wherein per-

---

2. The court noted that there was no evidence of an intent for the payments to continue after Dr. Sanfillippo's death.

3. Dr. Sanfillippo's obligations under the non-competition agreement would be terminated if the employment agreement was ended by defendant, without cause, prior to the last day of the employment agreement.

sonal performance by the promisor is the essence and the duty imposed cannot be done as well by others as by the promisor himself,...." 17A *C.J.S.* Contracts § 465 pp. 624-25 (1963).

Defendant asserts that under Missouri law, "personal services contract[s], including Covenant[s] Not to Compete, do not survive the death of the covenantor in the absence of language very specifically waiving the implied condition of survival of the covenantor to perform services called for in the contract." He primarily relies on the Western District case of *Siegfried v. I.G.T.W., Inc.,* 592 S.W.2d 248 (Mo.App.1980).[4] The trial court found *Siegfried* to be distinguishable. In *Siegfried,* Craig Siegfried entered into an installment sales contract for the sale of his radio station, KIMO. The contract had three parts. Part two of the contract provided for payments to Siegfried of $60,000 in monthly installments of $500.00 "in further mutual consideration of [Siegfried]'s personal special experience, skill, intelligence, energy, unique and specialized talent in the radio field" which Siegfried was to "impart" to the radio station's new owners. *Id.* at 249-50. Siegfried agreed to make himself available at "all reasonable times during business hours, but no more often than one day in any calendar month,...." *Id.* at 250. Siegfried also agreed, in part two of the contract, not to be employed, engaged or interested in the business of standard AM radio broadcasting within the effective range of the radio station. *Id.*

The *Siegfried* court held that part two of the agreement was one for personal services. It noted that personal services contracts terminate upon the death of the covenantor in the absence of an expressed intent that the payments continue after death. The court found no such intent. *Id.* at 251.

We agree with the trial court that *Siegfried* is distinguishable from the instant case. Though not explicitly addressed in *Siegfried,* it is clear from the contract terms that the consultation and the non-competition portions of the agreement were not severable. Unlike here, the agreement required Siegfried to render affirmative personal services. The court noted that the non-competition agreement was "[i]n addition" to the agreement to provide personal services. *Id.* at 250. The court had no need to address whether the non-competition portion of the agreement itself was for personal services.[5]

The trial court here was persuaded by the Texas case of *TPS Freight v. Texas Commerce Bank,* 788 S.W.2d 456 (Tex.App.—Fort Worth 1990). In that case, TPS Freight purchased the assets of a company called TPS Distributors/Consolidators, Inc. (Distributors). The vendors had previously purchased the company from Kenneth Blair who covenanted not to compete with Distributors. The vendors (to TPS) failed to fulfill their obligations to Blair and Blair began running the company as a "debtor in possession." *Id.* at 457. Blair returned the company to profitability and the vendors sold the company to TPS Freight. TPS Freight assumed the vendor's obligations to Blair and executed another non-competition agreement with Blair in which TPS agreed to pay Blair twenty-three monthly payments of $1,266.67 beginning February 1, 1986. Blair died on September 10, 1987, and TPS ceased making payments. The executors of Blair's estate brought an action against TPS to recover the

---

4. Defendant also cites *Jones v. Joy Manufacturing Co.,* 381 S.W.2d 860 (Mo.1964); *Stein v. Bruce,* 366 S.W.2d 732 (Mo.App.1963), and *McDaniel v. Rose,* 153 S.W.2d 828 (Mo.App.1941), as standing for this proposition.

5. This is also true in the cases cited by defendant from other jurisdictions. In *Bloom v. K & K Pipe and Supply Company,* 390 So.2d 770 (Fla.App. 1980), Joseph Bloom sold all of the stock in his supply company to Louis Barris. The parties executed a side agreement wherein Bloom would receive weekly payments in return for his pledge not to compete in any manner for ten years nor disclose information concerning the firm. The agreement also imposed an obligation on Bloom to answer any questions and respond to any requests for information. Bloom died one year later. The court held the agreement was one for personal services, and therefore no longer enforceable by Bloom's estate. There, the court's reasoning was based, in part, on Bloom's inability to perform the positive duties of the agreement. The court stated "the affirmative covenant required Mr. Bloom to 'answer any questions and respond to any requests for information from K & K....' This covenant became impossible to enforce because of Mr. Bloom's death." *Id.* at 773.

Likewise, *Jones v. Servel, Inc.,* 135 Ind.App. 171, 186 N.E.2d 689 (1962), involved a consultation obligation on the decedent's part.

balance due. The trial court found the covenant not to be a personal service contract and accelerated the balance due.

The appellate court held that the agreement not to compete was not a personal services contract, and, therefore, refused to imply a condition of promisor's survival. The court stated:

> Blair did not contract to provide any services or do anything for appellants, instead, he agreed to *refrain* from doing something.... If [TPS Freight] had wished to reserve the right to pay less than the full sum, in the event of Blair's death, they could have inserted such a condition into the contract.

*Id.* at 459.[6] (Emphasis in original).

 The only meaningful factual variation in the instant case from *TPS* is the existence of the employment agreement. The employment agreement is, however, severable. We are persuaded by the reasoning of *TPS* and hold that the non-competition agreement here was not one for personal services and accordingly, defendant's payment obligation did not terminate on Dr. Sanfillippo's death.

"It is the general rule that when a person by his contract charges himself with an obligation possible to be performed, *he must perform it,* unless its performance is rendered impossible by the act of God, by the law, or by the other party. In case a party desires to be excused from performance in the event of contingencies arising, it is his duty to provide therefore in his contract." *Stein v. Bruce,* 366 S.W.2d 732, 734 (Mo.App. 1963).

Defendant made no provision for termination of his obligation under the non-competition agreement upon the death of Sanfillippo. Nevertheless, he argues that he was deprived of the benefit of his bargain in that "the one person in the world whose unique

skill and knowledge of the dental practice ... who could assure a smooth transition ... and provide invaluable and intangible information" had died. While we agree this was a benefit defendant would have received pursuant to the employment contract, which both parties concede was terminated upon the death of Sanfillippo, that benefit was not associated with the non-competition agreement. The duty imposed on Dr. Sanfillippo by the non-competition agreement was that he not compete with the dental practice of the professional corporation. The benefit to defendant of that agreement was the lack of competition from Dr. Sanfillippo.

Judgment affirmed.

CRANDALL, P.J., and CRIST, J., concur.

---

6. In *Rudd v. Parks,* 588 P.2d 709 (Utah 1978), the Utah Supreme Court held that a seller's covenant not to compete, when part of an integrated sales contract, does not have a condition of survival. The contract in that case set a purchase price and allocated portions to equipment, customers accounts and a covenant not to compete.

In the instant case, the non-competition agreement and the employment agreement, though independent from each other, were condition precedents to the sales agreement. Commenta-

tors suggest that non-competition agreements made in the context of a business' sale are one method by which a vendee acquires a going concern's good will. *See* 4 *Corbin on Contracts,* § 885 pp. 555–56 (1951).

Contrary authority may be found in *Keller v. California Liquid Gas Corp.,* 363 F.Supp. 123 (Wyo.W.D.1973), which held that a non-competition agreement made ancillary to the sale of a gas company was a personal covenant which terminated on the death of the covenantor.