A94A0131. MAIL & MEDIA, INC. v. ROTENBERRY.
A94A0132. SULLIVAN GRAPHICS, INC. v. ROTENBERRY.
A94A0133. ROTENBERRY v. MAIL & MEDIA, INC.
(446 SE2d 517)

POPE, Chief Judge.

## Case No. A94A0131

In 1990, Mr. Rotenberry sold all issued and outstanding stock in a corporation he solely owned called Mail & Media, Inc. to Sullivan Graphics, Inc. Mail & Media was engaged in the business of developing and printing advertising circulars, inserts and catalogues for various retail establishments. At the time of the sale, Mr. and Mrs. Rotenberry entered into a noncompetition agreement with Mail & Media. The noncompetition agreement provided for payment to the Rotenberrys of $3,000,000, subject to certain restrictions. Mr. Rotenberry also entered into an employment agreement with Mail & Media for an initial three-year term at an annual salary of $300,000. Mr. Rotenberry died on May 23, 1992. Mail & Media made the requisite payments under the employment and noncompetition agreements until August 2, 1992. Mail & Media refused to make subsequent payments to Mrs. Rotenberry, contending its obligations under those agreements had ceased. Mrs. Rotenberry filed suit against Mail & Media, seeking sums allegedly due her personally and as executrix of the estate of Mr. Rotenberry pursuant to those agreements for the time period after August 2, 1992. Mail & Media counterclaimed for alleged breaches of fiduciary duty by the Rotenberrys while they were officers of Mail & Media. Mrs. Rotenberry and Mail & Media filed cross-motions for partial summary judgment on Rotenberry's claim and Rotenberry moved for summary judgment on Mail & Media's counterclaim. Mail & Media appeals from the trial court's grant of Mrs. Rotenberry's motion for partial summary judgment, denial of its motion for partial summary judgment and the grant of Mrs. Rotenberry's motion for summary judgment as to its counterclaims.

1. Mail & Media first contends the trial court erred in entering judgment in favor of Mrs. Rotenberry concerning the noncompetition agreement. Specifically, it argues that because the noncompetition agreement was a personal services contract, all of its obligations under that contract ceased upon Mr. Rotenberry's death. See OCGA § 53-7-8.

The issue of whether noncompetition agreements ancillary to the sale of a business are personal services contracts is one of first impression in Georgia. Other jurisdictions have addressed this issue, however, and the majority rule is that noncompetition agreements which are not part of larger agreements (such as employment contracts)

containing affirmative promises of personal services are *not* personal services contracts. Compare *Sanfillippo v. Oehler*, 869 SW2d 159 (Mo. App. 1993) (holding noncompetition agreement was not one for personal services when the agreement only required the promisor to refrain from certain activity) and *TPS Freight Distrib. v. Texas Commerce Bank-Dallas*, 788 SW2d 456 (Tex. App. 1990) (same) with *Bloom v. K & K Pipe &c. Co.*, 390 S2d 770 (Fla. Dist. Ct. App. 1980) (holding noncompetition agreement which also contained affirmative promise to answer buyer's questions was personal services contract).[1] When a noncompetition agreement ancillary to the sale of a business does not also require the seller to affirmatively provide services to the buyer, the essential benefit the buyer is purchasing is the business's good will (as opposed to the seller's expertise), see *Redmond v. Royal Ford*, 244 Ga. 711, 713 (261 SE2d 585) (1979); and the seller's death does not deprive the buyer of this benefit, particularly since the seller's heirs and successors will continue to be bound by the agreement. See *TPS Freight*, 788 SW2d at 458. We find *Sanfillippo* and *TPS Freight* persuasive, and therefore adopt their rule as our own: while a noncompetition agreement joined with affirmative promises is a personal services contract which terminates upon the death of the promisor, a noncompetition agreement standing alone, with no affirmative promises, is not.

In this case, the noncompetition agreement contains no affirmative promises. An employment agreement (discussed in Division 2) was executed at the same time as the noncompetition agreement, but it is a totally separate and independent document, with separate and independent consideration. See *Sanfillippo*, 869 SW2d at 161. Accordingly, Mail & Media's obligation under the noncompetition agreement did not terminate when Mr. Rotenberry died. As there is no evidence that the Rotenberrys or Mr. Rotenberry's heirs or successors competed with Mail & Media during the time periods set forth in the noncompetition agreement, the trial court properly entered judgment in favor of Mrs. Rotenberry (individually and as executrix of Mr. Rotenberry's estate) for the full amount owed the Rotenberrys under the noncompetition agreement as written.

2. We next consider whether the trial court properly held that

---

[1] *Keller v. California Liquid Gas Corp.*, 363 FSupp. 123 (D. Wyo. 1973), the only decision holding that a noncompetition agreement without any affirmative promises was a personal services contract, failed to distinguish between those noncompetition agreements which are made in the context of an employment agreement and those which are not. Because the *Keller* decision relied on case law dealing with the former without noting the distinction, we think its reasoning is flawed. Cf. *Redmond v. Royal Ford*, 244 Ga. 711, 713-714 (261 SE2d 585) (1979) (recognizing and emphasizing difference between noncompetition agreements ancillary to sale of business and noncompetition agreements ancillary to employment contracts).

Mrs. Rotenberry, as executrix of the estate of Mr. Rotenberry, is entitled to payment under the employment agreement. The employment agreement between Mr. Rotenberry and Mail & Media expressly contemplates the death or incapacity of Mr. Rotenberry. Pursuant to that agreement, in appreciation for Mr. Rotenberry's services, Mail & Media agreed to pay upon his death or incapacitation 50 percent of the compensation otherwise due him for the remainder of the initial term of the contract.

Mail & Media contends, however, that it is relieved of that obligation because the Rotenberrys breached fiduciary duties to Mail & Media. Specifically, Mail & Media contends that prior to its purchase Mr. Rotenberry placed in jeopardy Mail & Media's relationship with Bi-Lo, Inc., its largest customer, by setting up a reserve account for Bi-Lo. Mail & Media contends certain payments were made from that account for unusual expenses, including the personal expenses of Bi-Lo's advertising director, ultimately resulting in the loss of the Bi-Lo account. Mail & Media further alleges the Rotenberrys breached fiduciary duties owed to Mail & Media because (1) they knew about the unorthodox nature of the reserve account for Bi-Lo but failed to disclose that information before the purchase; and (2) they participated in setting up the reserve account and making unauthorized payments through it. Mail & Media also contends Mr. Rotenberry breached fiduciary duties owed to Mail & Media after the purchase by not revealing all information concerning the reserve account while he was acting as President of Mail & Media.

In granting summary judgment in favor of Mrs. Rotenberry, the trial court held that prior to the sale Mr. Rotenberry could not breach a fiduciary duty to the corporation because as the sole stockholder and director any action taken by him would have necessarily been ratified by the corporation. The trial court further held that the record did not support a finding that Mr. Rotenberry breached any fiduciary duty owed to Mail & Media after the purchase.

We hold that Mr. Rotenberry, as seller, did not owe a fiduciary duty to Sullivan Graphics during the time period the parties were negotiating the sale of Mail & Media. "A fiduciary or confidential relationship arises 'where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.' OCGA § 23-2-58. The law recognizes 'that a confidential relationship may exist between businessmen, depending on the facts.' [Cit.] . . . 'The mere fact that one reposes trust and confidence in another does not create a confidential relationship. "In the majority of business dealings, opposite parties have trust and confidence in each other's integrity, but there is no confidential relation-

ship by this alone." [Cit.]' [Cit.]" *Kienel v. Lanier*, 190 Ga. App. 201, 203 (378 SE2d 359) (1989).

Furthermore, employees of the purchaser were made aware of the reserve account before the purchase, but the record reveals that the purchaser's due diligence inquiry about the reserve account was less than thorough. Although Mail & Media asserts the purchaser's questions about the account were not fully answered, the purchaser's employees made the decision not to press for complete disclosure on the account. In fact, although the purchaser's employees met with Bi-Lo's advertising director and his supervisor before the sale was consummated and after they had knowledge of the reserve account, they did not inquire about the reserve account during the meeting. Also the purchaser had knowledge that Bi-Lo accounted for more than 50 percent of Mail & Media's business and that there was no written contract between Bi-Lo and Mail & Media. Still it willingly entered into the purchase agreement with nothing more than assurances from Bi-Lo that the relationship between Bi-Lo and Mail & Media was strong.

We find no breach of fiduciary duty by Mr. Rotenberry to Mail & Media under the facts of this case. The record reveals that Mail & Media set up the reserve account in question for Bi-Lo at the direction of either Bi-Lo's advertising director, his assistant or both.[2] Employees of Bi-Lo controlled the use of the reserve funds. Although there is no evidence that the Vice-President of Bi-Lo who supervised the advertising director knew the extent of how the reserve funds were used, he approved the concept of such an account and knew that the advertising director requested Mail & Media to pay for at least one unorthodox expense from that account, a skybox at a university football stadium. There is no evidence funds were appropriated for either the use of Mail & Media or any employee or principal of that corporation. While such an account constituted an unorthodox business practice and may evidence bad business judgment on the part of the Rotenberrys in agreeing to set up the account and maintain it in the manner directed by Bi-Lo's advertising director, there is no evidence that the Rotenberrys engaged in any conduct harmful to Mail & Media with regard to this account.

Moreover, assuming arguendo that the Rotenberrys breached a fiduciary duty to Mail & Media through the creation and use of a reserve account for Bi-Lo, there was no resulting harm to Mail & Media stemming from that account. The record does not support Mail & Media's contention that the creation and use of the Bi-Lo reserve account led to Mail & Media's loss of the Bi-Lo account. The employee

---

[2] The only other evidence of creation of a similar account by Mail & Media for another customer was for Red Foods after Bi-Lo's advertising director's assistant took a position with that company.

of Bi-Lo who decided to stop using Mail & Media was the person who replaced the long-time advertising director through whom Mr. Rotenberry had established Mail & Media's relationship with Bi-Lo. He testified he had no knowledge of the reserve account until after Bi-Lo had severed its relationship with Mail & Media. When pressed about the reason Bi-Lo severed its relationship with Mail & Media, he gave two reasons: (1) Bi-Lo had made the decision even before he was brought in to replace the former advertising director to bring the work Mail & Media was doing in-house; and (2) he was basically disappointed with how Mail & Media handled the Bi-Lo account after he took over. The new advertising director's supervisor confirmed that the use of the reserve account was not the reason Bi-Lo ceased doing business with Mail & Media.

The record also supports the trial court's finding that Mr. Rotenberry did not breach any fiduciary duty owed to Mail & Media after the purchase was complete. The evidence shows that when the purchaser expressed concern about the unusual reserve account for Bi-Lo, Mr. Rotenberry assured it that the account would be cleared up before the sale. Although there is some evidence that there was certain activity of that account after the sale, there was no evidence presented by Mail & Media that those transactions were questionable, or that those transactions prompted or were part of the inquiry the new director of advertising for Bi-Lo made to Mail & Media. We also find no merit in Mail & Media's contention that Mr. Rotenberry should have fully disclosed all activities of the Bi-Lo reserve account after the sale since, as we discussed above, the record does not support Mail & Media's contention that the creation and use of the reserve account resulted in the loss of Bi-Lo's business. At most, Mr. Rotenberry and others associated with Mail & Media may have contributed to the loss of the Bi-Lo account by not responding as promptly and thoroughly to inquiries made by the new director of advertising for Bi-Lo as the new director wanted. However, there is no evidence the new director of advertising inquired about the reserve account and all allegations concerning breach of fiduciary duty center on that account. We further note that Bi-Lo had decided to bring its printing work in-house before it experienced problems with Mail & Media handling its account, and Bi-Lo continued to use Mail & Media until it brought its work in-house. For all these reasons we hold the trial court did not err in granting Mrs. Rotenberry's motion for partial summary judgment, denying Mail & Media's motion for partial summary judgment and granting Mrs. Rotenberry's motion for summary judgment as to Mail & Media's counterclaims.

## Case No. A94A0132

In this case, applicant for intervention Sullivan Graphics, Inc. appeals the denial of its motion to intervene pursuant to OCGA § 9-11-24 (b) in this action. Sullivan Graphics argues that the claims it seeks to assert in this case for breaches of fiduciary duties by the Rotenberrys to Mail & Media stem from the same facts as those underlying Mail & Media's breach of fiduciary duty claims. However, it appears from the parties' assertions in their briefs that Sullivan Graphics seeks to assert claims against the Rotenberrys stemming from the stock purchase agreement, whereas no claim in Case No. A94A0131 stemmed directly from that agreement.

"Whether permissive intervention is granted is addressed to the sound discretion of the trial judge, and a decision on this issue will not be reversed unless there is an abuse of discretion. [Cit.]" *Sloan v. Southern Floridabanc Fed. Savings &c. Assn.*, 197 Ga. App. 601, 603 (2) (398 SE2d 720) (1990). It is well-settled that denial of a movant's motion to intervene is not error when "the one who seeks to intervene will still be left with his right to pursue his own independent remedy against the parties, regardless of the outcome of the pending case." *Gregory v. Tench*, 138 Ga. App. 219 (1) (a) (225 SE2d 753) (1976). This court takes judicial notice that Sullivan Graphics has filed suit against Mrs. Rotenberry in the United States District Court for the Northern District of Georgia, Case No. 1-93-CV-1174. Because Sullivan Graphics can pursue its claims in another forum, the trial court did not err in denying its motion for permissive intervention.

## Case No. A94A0133

The sole issue on appeal in this case is whether an agreement dated August 6, 1991, among and between Mail & Media and the Rotenberrys in which they agreed to defer the second and third installment payments under the noncompetition agreement, is an enforceable agreement even though it failed to recite what consideration, if any, they received in exchange for their promises. We agree with Mail & Media that this agreement constituted a valid waiver and for that reason the trial court did not err in upholding the agreement. We note that the noncompetition agreement expressly provided for waivers and only required that such agreements be in writing and signed by the parties to be charged. Certainly this agreement falls within that contractual description.

Furthermore, this agreement falls within the traditional definition of waiver: the intentional relinquishment of a known right. *Hathcock v. Hathcock*, 246 Ga. 233, 234 (271 SE2d 147) (1980); E. Allen

Farnsworth, Contracts, 587 (1990). A waiver is an unilateral action[3] that needs no consideration. Farnsworth, supra at 589. The Rotenberrys' course of conduct was consistent with a waiver of their right to payment under the original terms of the contract. All evidence of record shows that the Rotenberrys agreed to defer timely payment under the terms of the noncompetition agreement because, after Mail & Media lost the Bi-Lo account, it was in dire financial condition and making the requisite payments under the noncompetition agreement on time would have probably forced Mail & Media out of business. Furthermore, there is no evidence of record that the Rotenberrys contended they had not waived their right to timely payment under the noncompetition agreement before filing suit. This court will affirm the judgment of the trial court if it is right for any reason. Because we hold the disputed agreement constituted a valid waiver, the trial court did not err in enforcing that agreement.

*Judgments affirmed. McMurray, P. J., and Smith, J., concur.*

DECIDED JUNE 24, 1994 —
RECONSIDERATION DENIED JULY 13, 1994 —

*Smith, Gambrell & Russell, John G. Despriet, Dana M. Richens,* for Mail & Media, Inc. and Sullivan Graphics, Inc.

*Schreeder, Wheeler & Flint, David H. Flint, Mark W. Forsling,* for Rotenberry.

---

[3] We reject Rotenberry's argument that the agreement was bilateral in nature rather than unilateral. Mail & Media's obligation to make the payments was pre-existing, and the only change agreed to by the parties was that the Rotenberrys agreed to extend the time in which Mail & Media could timely make payments under the noncompetition agreement.