A05A0218, A05A0219. WALLIS v. B & A CONSTRUCTION
COMPANY, INC. et al.; and vice versa.

(614 SE2d 193)

RUFFIN, Chief Judge.

Bobbie Jo Wallis, acting individually and as executrix of her husband Joel Anderson Wallis' estate, sued B & A Construction Company, Inc. ("B & A") and Henry Washington "Buddy" Wallis, Jr. ("Buddy") for breach of a purchase contract, breach of a promissory note, and liability under a guaranty agreement. B & A and Buddy counterclaimed to recover various payments made to Wallis and the estate. The parties filed cross-motions for summary judgment, and the trial court granted in part and denied in part both motions.

In Case No. A05A0218, Wallis appeals the trial court's grant of partial summary judgment to B & A and Buddy. B & A and Buddy (collectively, "B & A") cross-appeal in Case No. A05A0219, arguing that the trial court erred in granting partial summary judgment to Wallis. For reasons that follow, we affirm the judgment in Case No. A05A0219, but affirm in part and reverse in part the judgment in Case No. A05A0218.

Summary judgment is appropriate when no genuine issues of material fact remain and the movant is entitled to judgment as a matter of law.[1] We review a trial court's summary judgment ruling de novo, construing the facts and all reasonable inferences in favor of the nonmoving party.[2]

Viewed in this manner, the record shows that Buddy and his first cousin, Joel Anderson "Andy" Wallis, incorporated B & A in February 1976. Buddy and Andy owned the company jointly, and both served at various points as B & A's president and secretary. In March 1999, however, Andy decided to sell his interest in B & A, and B & A, Buddy, and Andy entered into a purchase agreement.

Under the agreement, Buddy agreed to buy Andy's interest in certain real property in exchange for a cash payment at closing, plus

---

[1] See *Howard v. J. H. Harvey Co.*, 239 Ga. App. 677, 678 (521 SE2d 691) (1999).
[2] See id.

a $1,487,500 promissory note ("Obligation I"). The purchase agreement also provided for the purchase and redemption of Andy's company stock. The redemption clause required B & A to pay Andy a certain amount in cash at closing, as well as to deliver to Andy a $1,912,500 promissory note payable over ten years ("Obligation II"). Buddy personally guaranteed the payment of Obligation I and Obligation II.

In addition to these monetary terms, the purchase agreement contained a covenant not to compete, under which Andy agreed not to compete with B & A for ten years. Another contract provision obligated Andy to enter into a written employment agreement with B & A at closing. That agreement, which was attached as an exhibit to and incorporated into the purchase agreement, provided for an annual term of employment beginning March 15, 1999, and automatically renewing each year unless terminated in writing by either party. Finally, the purchase agreement included the following clause relating to payment of Andy's income taxes ("the tax clause"):

> As additional compensation for consulting and not competing with the business of [B & A] during the term of Obligation II (and not as additional redemption price), [B & A] shall pay [Andy's] federal and state income taxes on his receipt [of] all of the taxable portion of the down payments and all payments to be made under Obligation II and such taxes on Obligation I only in the event it is prepaid before the scheduled one-time balloon payment as set forth in Obligation I. The state and federal income taxes shall be calculated as if [Andy] has no other income during the periods in question. [Andy] will pay his income taxes on any employment compensation and on the compensation he receives pursuant to this paragraph.

The sale closed at the end of March 1999, and, following the sale, Andy continued serving as president of B & A under the employment agreement. In July 1999, however, Andy died. After Andy's death, B & A made payments to his estate pursuant to the Obligation II promissory note. In accordance with the purchase agreement's tax clause, B & A also made several payments to Andy's estate or Wallis for state and federal income taxes relating to the stock repurchase.

In 2001, B & A's bonding company advised B & A that, given Andy's death, B & A was not obligated to comply with the purchase agreement's tax clause. In order to partially recoup amounts paid under this clause since Andy's death, B & A deducted $100,000 from the Obligation II payment it otherwise owed the estate in August

2001. B & A also informed Wallis that it would make no further payments under the tax clause.

Wallis sued B & A and Buddy, arguing that B & A had breached the terms of the purchase agreement's tax clause and the Obligation II promissory note, resulting in default. She further alleged that Buddy was personally responsible for full payment under the note. B & A and Buddy answered and counterclaimed, asserting that B & A had not defaulted under the note, was not required to comply with the tax clause, and was entitled to recoup all payments made under that clause following Andy's death. After the parties filed cross-motions for summary judgment, the trial court determined that Andy's death terminated B & A's liability under the tax clause. Thus, the trial court awarded B & A summary judgment on Wallis' claims for breach of the purchase agreement and the Obligation II promissory note. With respect to B & A's counterclaim to recover past tax payments, however, the trial court granted Wallis summary judgment, finding that these payments fell within the "voluntary payment doctrine" in OCGA § 13-1-13.

In Case No. A05A0218, Wallis argues that the trial court erred in granting summary judgment to B & A because factual questions remain regarding the company's obligations under the tax clause. In Case No. A05A0219, B & A contends that it is entitled to recoup all payments made pursuant to that clause after Andy's death. Because the issues in both cases are inextricably intertwined, we address the two appeals together.

1. *Payments under the Tax Clause.* We agree with the trial court that Andy's death ended B & A's contractual obligations under the tax clause. In analyzing this contract provision, we must keep in mind that

> trial courts are required to construe unambiguous and unequivocal contracts, and the cardinal rule of construction is to ascertain the intent of the parties. If the parties' intent is clear from the contract terms, then a court should look to the contract alone. If the contract is ambiguous, a court may consider the attendant circumstances and the contracting parties' explanations to determine their intent. In addition, a court should construe a contract in its entirety and not merely by examining isolated clauses and provisions thereof.[3]

---

[3] (Punctuation and footnotes omitted.) *Pfeiffer v. Dept. of Transp.*, 250 Ga. App. 643, 646 (1) (551 SE2d 58) (2001), aff'd, 275 Ga. 827 (573 SE2d 389) (2002).

The purchase agreement's tax clause required B & A to pay Andy's state and federal income taxes as "compensation for [Andy] consulting and not competing with the business of [B & A]." By its clear terms, the tax obligation is not part of the stock redemption price — it is compensation for Andy's work and restraint from competition. In other words, the tax payments are linked directly to personal services Andy agreed to provide the company.

Generally, personal services contracts terminate upon the death of one of the parties. As we have noted,

> [f]rom the very nature of a contract for the rendition of personal services to [an employer] in its current business, where nothing is expressed to the contrary, both parties should be regarded as having by implication intended a condition dependent, on the one hand, upon the life of the employee, and on the other, upon the life of the [employer].[4]

Nothing in the tax clause expresses a contrary intent, supporting the conclusion that B & A's obligation to *compensate* Andy through tax payments depended on his continued life.[5]

On appeal, Wallis notes that Andy's employment agreement was terminable at will by either party upon 60 days notice. Thus, she argues, if the tax payments were tied to Andy's continued employment or performance of personal services, those "payments could be unilaterally defeated in favor of nonpayment by [B & A] upon . . . notice to Andy that his services were no longer required."[6] Asserting that the parties could not have intended to permit such unilateral destruction of the payment obligation, Wallis contends the tax provision is ambiguous, raising a jury question.

We disagree. The contracting parties specifically denominated the payment obligation as *compensation* for Andy's services. Thus, we see no ambiguity in finding that this obligation ended with the termination of those services.

Moreover, even if some ambiguity exists regarding the employment provision, the purchase agreement also forbade Andy from competing with the corporation for a ten-year period. And the tax payment is explicitly intended as compensation not only for his consulting services, but also for his agreement to refrain from competition.

---

[4] (Punctuation and emphasis omitted.) *C & S Trust Co. v. Hicks*, 216 Ga. App. 338 (1) (454 SE2d 207) (1995).

[5] Compare id. at 339; see also *Griggs v. Swift*, 82 Ga. 392, 395-396 (9 SE 1062) (1889).

[6] (Punctuation omitted.)

In *Mail & Media, Inc. v. Rotenberry*,[7] we examined whether a noncompetition agreement ancillary to the sale of a business constitutes a personal services contract. We noted that a majority of jurisdictions had determined that "noncompetition agreements which are not part of larger agreements (such as employment contracts) containing affirmative promises of personal services are *not* personal services contracts."[8] Adopting this rule, we held: "while a noncompetition agreement joined with affirmative promises is a personal services contract which terminates upon the death of the promisor, a noncompetition agreement standing alone, with no affirmative promises, is not."[9]

The noncompetition provision in this case is intertwined with an employment agreement, and both are part of the larger purchase contract. Furthermore, the tax clause specifies that the tax payments constitute compensation for Andy's consulting work *and* for his not competing with B & A. In other words, the promises to consult and refrain from competition are tied together, undermining any conclusion that the noncompetition provision is separate from any promise of personal services.[10]

Because the tax clause obligation depended upon the provision of personal services, we agree with the trial court that the obligation terminated upon Andy's death. Accordingly, B & A is not required to make further payments under this clause, and the trial court properly granted B & A summary judgment on this issue in Case No. A05A0218.

In ruling on the tax clause issue, however, the trial court also granted B & A summary judgment on Wallis' claim that the company breached the Obligation II promissory note by unilaterally reducing its August 2001 payment by $100,000. As discussed below, the voluntary payment doctrine bars such recoupment. Thus, we must reverse the trial court's ruling in Case No. A05A0218 to the extent it awarded summary judgment to B & A on this portion of Wallis' claim.

2. *Recoupment of Past Tax Payments.* B & A seeks to recoup all payments made to the estate under the tax clause since Andy's death, and it has pursued this recovery in two ways. First, it unilaterally deducted $100,000 from the August 2001 payment to Andy's estate. Second, it has counterclaimed against Wallis to recoup additional amounts paid under the tax clause.

---

[7] 213 Ga. App. 826 (446 SE2d 517) (1994).

[8] (Emphasis in original.) Id. at 826-827 (1).

[9] Id. at 827.

[10] Compare id. (noncompete agreement does not constitute a personal services contract where contemporaneously executed employment agreement is "a totally separate and independent document, with separate and independent consideration").

"Recoupment is a right of the defendant to have a deduction from the amount of the plaintiff's damages for the reason that the plaintiff has not complied with the cross-obligations or independent covenants arising under the contract upon which suit is brought."[11] Pursuant to OCGA § 13-7-12, such right "lies for overpayments by the defendant or for payments by fraud, accident, or mistake." Citing these and other principles, B & A claims that it is entitled to recoup all tax payments erroneously made after Andy's death. Like the trial court, we disagree and find the voluntary payment doctrine applicable here.

As codified in OCGA § 13-1-13, the voluntary payment doctrine provides:

> Payments of claims made through ignorance of the law or where all the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party are deemed voluntary and cannot be recovered unless made under an urgent and immediate necessity therefor or to release person or property from detention or to prevent an immediate seizure of person or property. Filing a protest at the time of payment does not change the rule prescribed in this Code section.

Thus, under Georgia law, "money voluntarily paid may not ordinarily be recovered."[12] This rule, however, is subject to several exceptions, including situations involving a mistake of law. As we have noted, "[i]f payment was made in ignorance of law, recovery is barred; if in mistake of law, recovery is permitted."[13]

B & A has not argued that it was unaware of any facts — such as Andy's death — when it made the tax payments or that any misplaced confidence, artifice, deception, fraudulent practice, or immediate necessity to remit payment renders the voluntary payment doctrine inapplicable. Instead, it apparently claims that (a) its erroneous payment constitutes a mistake of law, permitting recovery; (b) inherent tensions among OCGA §§ 13-1-13, 13-7-12, and 23-2-22 require us to ignore the voluntary payment doctrine; and (c) language in the Obligation II promissory note specifically allows this recovery and supersedes OCGA § 13-1-13. We will address each argument in turn.

(a) Buddy testified that, following Andy's death, B & A made tax payments until its bonding company advised it that the death terminated such obligation. B & A did not solicit this advice from the

---

[11] OCGA § 13-7-2.

[12] (Punctuation omitted.) *Emond v. State Farm &c. Ins. Co.*, 175 Ga. App. 548, 550 (2) (333 SE2d 656) (1985).

[13] (Punctuation omitted.) Id.

bonding company; the bonding company raised the issue. And when questioned about why he authorized tax payments after Andy's death, Buddy stated: "I really didn't pay any attention to it, to be frank."

Clearly, B & A did not analyze the issue before making the post-death payments, much less mistakenly determine that, under Georgia law, the purchase contract required continued payment. Moreover, at the time it made the payments, B & A was well aware of both the purchase contract language and Andy's death. Despite this knowledge, it chose to pay Wallis and the estate " 'voluntarily, however unwisely.' "[14]

A mistake of law occurs "[w]here one acts under a mistake of what the law was as applicable to the state of facts, or was requiring."[15] B & A has pointed to no evidence that it was mistaken as to what the law was or required with respect to the tax payments. Instead, it simply paid under the contract until informed that payment was no longer required. Under these circumstances, the payments were made in ignorance — rather than mistake — of the law.[16]

(b) B & A argues that the voluntary payment doctrine conflicts with OCGA § 23-2-22, which provides: "An honest mistake of the law as to the effect of an instrument on the part of both contracting parties, when the mistake operates as a gross injustice to one and gives an unconscionable advantage to the other, may be relieved in equity."

By its terms, however, OCGA § 23-2-22 offers relief following a *mistake* of law. It does not address situations involving ignorance of the law. Similarly, a mistake of law does not trigger the voluntary payment doctrine under OCGA § 13-1-13.[17] Instead, OCGA § 13-1-13 prohibits recovery of a payment voluntarily made in *ignorance* of the

---

[14] *Chemin v. State Farm &c. Ins. Co.*, 226 Ga. App. 702, 704 (487 SE2d 638) (1997). See also *Fitzgerald Water &c. Comm. v. Shaw Indus.*, 270 Ga. App. 68, 70-71 (1) (606 SE2d 10) (2004).

[15] (Punctuation and emphasis omitted.) *Emond*, supra.

[16] See *Chemin*, supra at 703-704 (insured made payments to insurance company in ignorance of law where both parties were aware of contract language, no mistake regarding that language or any fact existed, and insurance contract either "did or did not require the . . . payments"); see also *Telescripps Cable Co. v. Welsh*, 247 Ga. App. 282, 285 (1) (542 SE2d 640) (2000) (plaintiffs who paid cable television late fees, then later claimed late fees unenforceable under the law, were not entitled to recoup the fees; although plaintiffs asserted that they did not know the late fees were unenforceable when they made the payments, Court found that the payments were made in ignorance of law). Compare *Emond*, supra (mistake of law occurred, and voluntary payment doctrine did not apply, where insurer made payment after misinterpreting Georgia's no-fault law, which had caused confusion among the bench, bar, insurers, and insureds).

[17] See *Emond*, supra.

law.[18] And a clear distinction exists between actions taken in ignorance of the law and those taken in mistake of the law. Thus, the relief granted by OCGA § 23-2-22 for legal mistakes does not conflict with the voluntary payment doctrine.

B & A also claims that the voluntary payment doctrine conflicts with OCGA § 13-7-12, which permits recoupment for an overpayment or a payment made by fraud, accident, or mistake. For the reasons discussed above, we find no conflict between the recovery permitted under OCGA § 13-7-12 for fraudulent, accidental, or mistaken payments and the voluntary payment doctrine's bar to recovery in the face of ignorance.

Nevertheless, given the general reference to overpayment in OCGA § 13-7-12, B & A apparently contends that it can recoup *any* overpayment, regardless of whether made in ignorance of the law, and despite the restrictions in OCGA § 13-1-13. We disagree. Even if this general overpayment language creates a potential conflict between OCGA §§ 13-7-12 and 13-1-13, such conflict presents no basis for recovery here.

As an initial matter, we do not view the contested tax payments as an "overpayment." The purchase agreement required B & A to pay sums under the tax clause. B & A now correctly argues that Andy's death ended its obligation under the tax provision, and it seeks to recoup all sums paid pursuant to that clause since the death. It does not argue that it *overpaid* Andy's taxes; it claims that it does not owe *any* money under the provision.

Furthermore, even if this case involves an overpayment, OCGA § 13-7-12 does not authorize recoupment. In construing conflicting statutes, we look to the general rules of statutory construction.[19] Under those rules, "a specific statute will prevail over a general statute, absent any indication of a contrary legislative intent, to resolve any inconsistency between them."[20] Although OCGA § 13-7-12 arguably allows recoupment for any overpayment, OCGA § 13-1-13 more specifically provides that payments may not be recovered if made in ignorance of the law. And we have applied OCGA § 13-1-13 to overpayments.[21] To the extent a conflict exists, therefore, we cannot construe OCGA § 13-7-12 to permit recoupment of an overpayment made in ignorance of the law.

---

[18] See id.

[19] See *Hooks v. Cobb Center Pawn & Jewelry Brokers*, 241 Ga. App. 305, 309 (6) (527 SE2d 566) (1999).

[20] (Punctuation and emphasis omitted.) Id.

[21] See *Fitzgerald*, supra; *Yeazel v. Burger King Corp.*, 241 Ga. App. 90, 97-101 (3) (526 SE2d 112) (1999).

(c) Finally, B & A argues that language in the Obligation II promissory note specifically authorizes the recovery sought, despite the voluntary payment doctrine. Paragraph 11 of the note provides that, "[n]otwithstanding any provision herein, in the Purchase Agreement, or elsewhere to the contrary, the amounts due the Holder hereunder shall be subject to set-off." According to B & A, Georgia law permits contracting parties to agree to relief not otherwise allowed under the law, as long as that relief does not violate public policy. Thus, it argues, it is entitled under the contract to recover its previous tax payments as a "set-off."

The promissory note does not define "set-off." Under Georgia law, however, the terms "set-off" and "recoupment" are not synonymous. "[A] set-off is a counter-demand which a defendant holds against a plaintiff, arising out of a transaction extrinsic [or] independent of the plaintiff's cause of action."[22] A "recoupment," on the other hand, involves a claimed "right to a deduction from the plaintiff's damages for breach of a cross obligation arising from the same contract."[23]

B & A's claims in this case clearly implicate recoupment, rather than set-off. Wallis sued for breach of the purchase agreement and Obligation II promissory note. B & A argues that it has committed no breach because it was not required to render payments under the purchase agreement's tax clause after Andy's death. Its effort to recover past payments, therefore, arises from an agreement at the center of Wallis' cause of action, rather than a separate transaction or debt.

Moreover, we see no distinction between the recoupment sought through B & A's counterclaim and the $100,000 that B & A unilaterally deducted from its August 2001 payment to Andy's estate. Through both the counterclaim and the unilateral deduction, B & A has sought to reduce the amount it owes under the purchase agreement and to recover amounts previously paid pursuant to that contract. Both recovery methods fall logically within the definition of recoupment (a deduction arising from the same contract as the plaintiff's right to recovery), rather than the definition of set-off (a deduction for an independent transaction or debt). Thus, because both recovery methods involve recoupment, the promissory note's set-off provision does not control either.

(d) In sum, the trial court properly concluded in Case No. A05A0219 that the voluntary payment doctrine bars B & A's recovery of past payments made to Wallis or Andy's estate under the tax

---

[22] (Punctuation omitted.) *Gwinnett Commercial Bank v. Flake*, 151 Ga. App. 578, 580 (1) (260 SE2d 523) (1979).

[23] *Johnson v. Raatz*, 200 Ga. App. 289, 292 (407 SE2d 489) (1991).

clause. As noted in Division 1, however, the trial court apparently found in Case No. A05A0218 that the voluntary payment doctrine does not apply to the $100,000 deducted by B & A from its August 2001 payment. Although B & A made that deduction unilaterally, rather than filing a claim or counterclaim relating to the money, we see no reason why OCGA § 13-1-13 should not bar this recovery as well.[24] To find otherwise would allow a debtor to defeat Georgia's voluntary payment doctrine simply by making unilateral deductions from future amounts owed a creditor.

*Judgment affirmed in part and reversed in part in Case No. A05A0218. Judgment affirmed in Case No. A05A0219. Johnson, P. J., and Barnes, J., concur.*

DECIDED APRIL 21, 2005.

*Benjamin L. Bagwell*, for appellant.
*Stewart, Melvin & Frost, J. Douglas Stewart, Smith, Curry & Hancock, Thomas E. Abernathy IV*, for appellees.

---

[24] See *Emond*, supra (applying OCGA § 13-1-13 to insurer's request that money erroneously paid to an insured as "excess medical payment benefits" be reclassified as "optional PIP benefits").