United States Court of Appeals,

Eleventh Circuit.

No. 94-9105.

John R. WILLIAMS and John B. Williams, Plaintiffs-Appellees, Cross-Appellants,

v.

DRESSER INDUSTRIES, INC., Defendant-Appellant, Cross-Appellee.

Aug. 28, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:92-cv-333-RHH), Robert H. Hall, Judge.

Before COX, Circuit Judge, and KRAVITCH and CLARK, Senior Circuit Judges.

CLARK, Senior Circuit Judge:

In this diversity action, the appellees, John R. Williams ("John Williams") and his son John B. Williams ("Jay Williams"), negotiated and bought a distributorship of heavy construction equipment that carried the appellant Dresser Industries, Inc.'s ("Dresser") products as their main line. Less than a week after the Williams purchased the distributorship, Dresser announced its intent to enter into a joint venture with another heavy construction equipment manufacturer, Komatsu, Ltd. ("Komatsu"). The appellees alleged that the joint venture was harmful to their business because customers feared that the Dresser product would become obsolete, that Dresser fraudulently concealed information about the pending joint venture in order to induce their purchase of the distributorship, and that they would not have bought the distributorship had they known about the pending joint venture. The appellees claimed that the joint venture led to a significant loss of business that ultimately forced them to sell their business at a loss. The jury returned a verdict for the appellees and awarded them over ten million dollars in damages. The appellant contends that the district court erred in denying the motion for judgment notwithstanding the verdict because the appellees did not prove the elements of fraud required under Georgia law. We agree with the appellant and reverse the judgment.

I. BACKGROUND

Dresser was primarily an oil service company that acquired International Harvester's construction equipment business in 1982, but was a lesser player in the heavy construction equipment industry which was dominated by other companies such as Caterpillar and Komatsu. The leading companies in the industry had the money to invest in research and development of new equipment, and the smaller companies struggled to keep up with the pace of innovations. Dresser was one of the companies having difficulty staying competitive in the industry. Joint ventures were increasingly common in the industry as the strategy for survival, and Dresser began talking with potential joint venture partners in 1986. In late summer of 1987, Dresser's senior management began preliminary discussions with Komatsu about the possibility of a joint venture. The two companies signed a confidentiality agreement restricting information of the discussions about the potential joint venture to their senior executives.

The Williams were Georgia residents who were sophisticated business executives, having owned and managed numerous businesses for years. John Williams expanded his father's lumber company from one store to ten stores, added a sawmill, and expanded into the concrete business in 1965. John Williams took his concrete business from one plant and eight trucks to 31 plants and 600 trucks. John Williams asked his son, Jay Williams, to run a block plant, and when the Williams sold their business they owned six block plants. The Williams sold their building materials company in 1986 for $90,000,000, and sought a new business.

They learned that a heavy equipment distributorship, the Tri-State Tractor Company ("Tri-State") was for sale, and on January 5, 1988, the Williams signed a letter of intent to purchase Tri-State. Because Dresser's permission was necessary for the sale of the distributorship, the Williams contacted Dresser to obtain its consent, and to place an initial order of inventory. Dresser denied the inventory order, and the Williams traveled to Chicago to meet with Dresser representatives.

In Chicago, the Williams met with the marketing and sales vice president of the construction equipment division, Wesley Lee, and with other Dresser employees; none of the Dresser employees with whom they met knew about the possible joint venture. The negotiations lasted approximately

2

four hours, and Lee repeatedly left the room apparently in order to consult with someone with higher authority. During the meeting, the Williams asked Lee about Dresser's future, and Lee responded that Dresser would be "second to none," that they were planning to hire additional engineers and would make Dresser "one of the leading machinery people in the business."[1] The Williams assumed that they would meet with Gary Eggerichs, the head of Dresser's construction equipment division, although they had not asked for a meeting with him, but Eggerichs was not part of that meeting. Eggerichs, who knew of the joint venture, met and spoke with the Williams briefly in the hallway after the meeting concluded. The Williams left Chicago having successfully negotiated an initial inventory order of ten million dollars.

On January 28, 1988, the Williams closed the purchase of Tri-State and executed their franchise agreement with Dresser. That same day, senior executives of Dresser and Komatsu signed a letter of understanding regarding the joint venture. Three days later, January 31, 1988, Dresser and Komatsu announced the pending joint venture during a trade show in New Orleans. Jay Williams attended the trade show and learned of the joint venture along with all the other Dresser distributors at that time.

The Williams did not attempt to rescind their purchase of Tri-State, and several weeks later confirmed their initial inventory order in writing without mentioning any concerns about the pending joint venture. Jay Williams did not communicate his concerns regarding the joint venture to Dresser until September 19, 1988. In a letter, Jay Williams stated that it appeared that both Komatsu and Dresser dealers would soon be selling "functionally identical equipment" and that Tri-State "may greatly be damaged if not substantially destroyed" because of the competition from the Georgia Komatsu dealer, a larger company.[2] Williams also stated that they "might well have elected not to purchase Tri-State Tractor Company at all had we been timely advised to the plans for the joint venture," and that they "believe[d] that Dresser had a duty to disclose its imminent plans for the joint

[1]R18 at 96.

[2]Plaintiff's Exh. 528.

3

venture to us before we agreed to acquire Tri-State."[3] In November of 1989, after incurring losses for 1988 and 1989, the Williams sold Tri-State to the Georgia Komatsu dealer. At the time of trial, Dresser products continued to be sold through the company formed by the joint venture between Dresser and Komatsu.

The Williams brought their complaint alleging that Dresser had fraudulently induced their participation as a distributor by concealing the information about the pending joint venture, and that had they known about the joint venture, they would not have bought Tri-State. Dresser filed a motion to dismiss, claiming that they had no duty to disclose their plans because they had no fiduciary or confidential relationship with the Williams, and that an allegation of misrepresentation and concealment of a future event did not state a claim.

The district court denied the motion to dismiss, noting that Georgia law imposed a duty to disclose material facts in light of either a confidential relationship or the particular circumstances of the case.[4] The district court found that the Williams had alleged sufficient facts giving rise to a duty to disclose because of the particular circumstances.[5] The district court also found that the Williams alleged that Dresser fraudulently concealed and misrepresented the existing fact of its present intention to enter the joint venture.[6] The case proceeded to a jury trial, and at the end of the plaintiff's case, Dresser moved for a directed verdict. Dresser argued that the Williams failed to exercise due diligence in investigating Dresser before they bought Tri-State, and that Wes Lee's comments to the Williams were mere puffing or statements as to future events. The district court denied the motion, and the jury returned a verdict for the Williams of $6,557,683 in compensatory damages and $4,000,000 in punitive damages. The district court denied Dresser's subsequent motion for judgment notwithstanding the verdict, and this appeal followed.

---

[3]*Id.*

[4]*Williams v. Dresser Industries, Inc.,* 795 F.Supp. 1144, 1148 (N.D.Ga.1992).

[5]*Id.* at 1150.

[6]*Id.* at 1152.

4

## II. DISCUSSION

This court reviews a district court's denial of a motion for judgment as a matter of law *de novo*.[7] We consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[8] In our review, we consider all the evidence and inferences in a light most favorable to the nonmoving party.[9] If the facts and inferences overwhelmingly favor one party, such that reasonable people could only arrive at one verdict, then the motion should have been granted.[10] However, if substantial evidence exists in opposition to the motion such that reasonable people, exercising impartial judgment, might reach differing conclusions, then the motion should have been denied and the case submitted to the jury.[11] There must be more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; "there must be a substantial conflict in evidence to support a jury question."[12]

Under Georgia law, a plaintiff suing for recovery for fraudulent misrepresentations must prove five essential elements: (1) the defendant made representations; (2) knowing they were false; (3) intentionally and for the purpose of deceiving the plaintiff; (4) which the plaintiff reasonably relied on; (5) with the proximate result that the plaintiff incurred damages.[13] Georgia law further provides that "[s]uppression of a material fact which a party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the

---

[7]*Sherrin v. Northwestern Nat'l Life Ins. Co.,* 2 F.3d 373, 377 (11th Cir.1993).

[8]*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

[9]*Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989).

[10]*Id.*

[11]*Id.*

[12]*Id.*

[13]*Bacote v. Wyckoff,* 251 Ga. 862, 865, 310 S.E.2d 520, 523 (Ga.1984).

parties or from the particular circumstances of the case."[14]  An obligation to disclose must exist

before a party may be held liable for fraud based upon the concealment of material facts.[15]

A. *The duty to disclose*

1. *The confidential relationship analysis*

Generally, business relationships are not confidential relationships.[16]  The mere fact that one

reposes trust and confidence in another's integrity does not create a confidential relationship.[17]  The

appellees do not refer to any Georgia cases finding a confidential relationship between a franchisor

and franchisee, and our research does not reveal any.  The closest Georgia case on point held that

no confidential relationship existed between a franchisor and franchisee, where the transaction at

issue was between the parties, each attempting to further their own separate business objectives,

rather than joining together to achieve a common business objective.[18]

In cases where Georgia courts have found the existence of a confidential relationship in

business, the parties have had either a history of business dealings with each other or the kind of

relationship that is not arms-length, such as a partnership or principal and agent.[19]  However,

Georgia courts have recognized that even though the parties were acquainted as friends or business

associates prior to a business transaction, a confidential relationship is not automatically

---

[14]O.C.G.A. § 23-2-53 (1982).

[15]*William Goldberg & Co., Inc. v. Cohen,* 219 Ga.App. 628, 466 S.E.2d 872, 877 (Ga.App.1995).

[16]*Dover v. Burns,* 186 Ga. 19, 26, 196 S.E. 785 (Ga.1938).

[17]*Id.*

[18]*Allen v. Hub Cap Heaven, Inc.,* 225 Ga.App. 533, 484 S.E.2d 259, 264 (Ga.App.1997).  *See also Kienel v. Lanier,* 190 Ga.App. 201, 204, 378 S.E.2d 359, 361 (Ga.App.1989)(where parties were engaged in a transaction with each other to further their own separate business objectives, no duty exists to represent or advance the other's interests).

[19]*See, e.g., Reeves v. B.T. Williams & Co.,* 160 Ga. 15, 127 S.E. 293 (1925)(parties had two prior contracts preceding the contract in dispute, with the same terms each time);  *Gilmore v. Bell,* 223 Ga.App. 513, 478 S.E.2d 609 (Ga.App.1996)(parties were friends and fraternity brothers in college, then business partners together);  *Vitner v. Funk,* 182 Ga.App. 39, 354 S.E.2d 666 (Ga.App.1987)(parties had been business partners for several years).

established.[20] Although the existence of a confidential relationship depends upon the circumstances and therefore is generally a jury issue, when the facts do not authorize a finding of a confidential relationship, the trial court does not err in deciding the issue as a matter of law.[21]

There are no facts in the present situation which would support a finding that the Williams and Dresser had a confidential relationship. It is undisputed that the Williams initiated contact with Dresser in connection with their desire to purchase Tri-State and that the parties had no prior business dealings. Dresser agreed to the transfer of the distributorship and negotiated the Williams' initial inventory order. These actions did not create more than a mere business relationship or provide a history of business dealings sufficient to support a finding of a confidential relationship. The transaction between Dresser and the Williams was to further their own separate business objectives, rather than one where they were joined together to achieve a common business objective. This was, plainly and simply, an arms-length business transaction.

2. *The particular circumstances analysis*

Georgia law also imposes an obligation to disclose in light of the particular facts and circumstances.[22] The Williams refer us to several Georgia cases holding that a jury could have found fraud from the particular circumstances of the case. In the first case, *Gellis v. B.L.I. Constr. Co., Inc.*, 148 Ga.App. 527, 251 S.E.2d 800,[23] a developer/borrower and a general contractor had a contract to build an apartment complex, with the funds coming from a lender.[24] The contract

---

[20]*See, e.g., William Goldberg & Co., Inc.,* 219 Ga.App. 628, 466 S.E.2d 872 (financial consultant to company had no confidential relationship with company's sole owner); *Harish v. Raj,* 222 Ga.App. 248, 474 S.E.2d 624 (Ga.App.1996)(plaintiff and defendant had no confidential relationship even though they grew up in the same community and were close friends); *Cole v. Cates,* 113 Ga.App. 540, 149 S.E.2d 165 (Ga.App.1966)(no confidential relationship between 84-year-old seller of real estate and agent who knew each other "many years").

[21]*Preston v. Nat'l Life and Accident Ins. Co.,* 196 Ga. 217, 237, 26 S.E.2d 439 (Ga.1943).

[22]O.C.G.A. § 23-2-53.

[23]148 Ga.App. 527, 251 S.E.2d 800 (Ga.App.1978).

[24]*Gellis,* 251 S.E.2d at 804.

contained a provision for the lender to withhold 10% of each progress payment as retainage reserve until the complex was 50% completed, but the lender required that the contract be changed so that the provision extended the 10% withholding until the project was completed.[25] After closing the construction loan, the lender allowed the developer to pay interest on the loan from undisbursed loan proceeds including the retainage, which depleted the loan proceeds, without notifying the contractor and in violation of the contract.[26] The appellate court found that the trial court properly allowed the issue to be submitted to the jury on the theory of fraud by concealment.[27]

*Tower Financial Services, Inc. v. Jarrett*[28] held that the trial court had properly allowed the issue of fraud to go to the jury where the seller of property brought an action against the purchaser and the lender because the lender had conducted the closing in violation of the sales contract.[29]

In *Hendrix v. Scarborough,*[30] the maker of a note brought suit for the note, which was a guaranty for a loan to a corporation of which the appellants and two other persons were all of the directors and shareholders.[31] In their affirmative defenses, the appellants alleged that the maker requested that all four directors sign the guaranty as a condition precedent to the note's validity and that they signed with the understanding that the other two directors would sign the guaranty immediately after they did.[32] The appellants alleged that the maker never told them that the other two directors refused to sign the note, and they filed a third party complaint against the other two

---

[25]*Id.* at 809-810.

[26]*Id.* at 809-810.

[27]*Id.* at 810.

[28]199 Ga.App. 248, 404 S.E.2d 622 (Ga.App.1991).

[29]*Jarrett,* 404 S.E.2d at 624.

[30]131 Ga.App. 342, 206 S.E.2d 42 (Ga.App.1974).

[31]*Hendrix,* 206 S.E.2d at 44.

[32]*Id.*

directors.[33]  The court found that the appellants' pleading of constructive fraud as an affirmative defense was sufficient to survive a motion to dismiss.[34]

The cases that the Williams cite in support of their argument that the particular circumstances of the case allow a finding of a duty to disclose are distinguishable.  In these cases, the parties alleged that the actions constituting fraud were committed in violation of the terms of an existing contract regulating the particular actions.  Here, the Williams have not shown that Dresser's actions violated the terms of any contract they had regulating the flow of information between them.  Because a jury could not have found that Dresser and the Williams had a confidential relationship or that there were particular circumstances creating a duty to disclose, the district court should have granted Dresser's motion for judgment as a matter of law.

Dresser relies on a Sixth Circuit case, *O'Neal v. Burger Chef Systems, Inc.,*[35] in which a franschisee sued a franchisor for fraudulent nondisclosure and breach of contract after the parent corporation sold the franchise without giving the franchisees notice of the pending sale.  The Sixth Circuit held that the franchisor had no duty to disclose the pending sale under Tennessee law, which created a duty to disclose only where there was a previous confidential relationship between the parties or where the contract or transaction was intrinsically fiduciary and called for good faith.[36] The circuit court reversed the district court, which had relied on a case involving a contract between a builder and a lot owner.[37]  The circuit court's reasons for rejecting the district court's reliance on the contract case are extremely relevant here:

> [That] fact situation is about as far removed from the world of multi-national corporations and their relationship with their diverse subsidiaries as it is possible to get.  This is the era of mergers and acquisitions, and corporations are regularly bought, sold, taken over, or

---

[33]*Id.*

[34]*Id.* at 45.

[35]860 F.2d 1341 (6th Cir.1988).

[36]*Id.* at 1349-50.

[37]*Id.* at 1351.

9

otherwise subjected to abrupt changes in ownership. The reasons for these acquisitions or divestitures are as diverse as are the nature of the companies involved. Everything from seeking favorable tax advantages to diversification as well as less admirable motives such as "greenmail" are involved. There are innumerable legitimate reasons why these decisions cannot be made public in advance. There are also conceivably some illegitimate reasons. There is certainly no presumption, however, that a failure to disclose intent somehow equates with fraud. This is particularly true when we are talking about relationships arising by contract with third parties as opposed to those relationships stemming from an ownership interest in the corporation such as that with shareholders.[38]

The Sixth Circuit's reasoning is sound, and applicable to this case. The Williams argue that this case is distinguishable because unlike Tennessee, Georgia provides for a duty to disclose because of the particular circumstances of the case. It is true that Georgia law provides a duty to disclose in some instances where Tennessee law does not. But the Sixth Circuit came to the same conclusion in a case involving the same facts and similar claims that was brought under Indiana law.[39] Like Georgia law, Indiana law imposes a duty to disclose when a fiduciary relationship exists, which can arise from the circumstances of the case.[40] The Sixth Circuit's reasoning and conclusion are persuasive.[41] Moreover, as discussed below, the facts of this situation do not allow a finding of a duty to disclose as a matter of law under Georgia law.

The district court also found that the Sixth Circuit case did not apply because the parties here were merely in negotiations and did not have an established relationship, unlike the franchisor

---

[38]*Id.* at 1351.

[39]*See Vaughn v. General Foods Cor.,* 797 F.2d 1403, 1414 (7th Cir.1986), *cert denied,* 479 U.S. 1087, 107 S.Ct. 1293, 94 L.Ed.2d 149 (1987) (holding that even though Indiana law allows a duty, franchisor had no duty to disclose sale of the corporation to franchisees).

[40]*Id.* at 1413-14.

[41]Most jurisdictions hold that except in cases of franchise terminations or when a duty is created by the express terms of a contract, courts do not impose general fiduciary obligations upon franchisors. *See Rajala v. Allied Corp.,* 919 F.2d 610, 623 (10th Cir.1990), *cert. denied,* 500 U.S. 905, 111 S.Ct. 1685, 114 L.Ed.2d 80 (1991); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 485 (5th Cir.1984); *Bright v. Land O'Lakes, Inc.,* 844 F.2d 436, 440 (7th Cir.1988). *But see Arnott v. American Oil Co.,* 609 F.2d 873, 881 (8th Cir.1979), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980) (South Dakota statute created a fiduciary duty in a franchise relationship); *cf. Bain v. Champlin Petroleum Co.* 692 F.2d 43, 48 (8th Cir.1982) ("*Arnott* does not stand for the proposition that the grant of a franchise of itself in all instances imposes on the franchisor all of the duties and responsibilities which traditionally pertain to a true fiduciary.").

and the franchisee.[42] The district court did not refer to any law supporting its proposition that parties negotiating a contract have a higher duty to disclose than do parties who have entered into a contract.[43] Georgia law holds otherwise: parties negotiating a contract do not have a confidential relationship requiring disclosure about the subject of the contract.[44] Because Georgia law has allowed a finding of a confidential relationship where the parties have had a history of business dealings with each other but not where the parties have had no previous dealings, it is a logical inference that parties have a higher duty to each other when they have had a contract between them and not when they are merely negotiating to enter into a contract. The district court erred in concluding otherwise. *See Reyes v. Atlantic Richfield Co.,*[45] (holding that franchisor has no duty of disclosure to prospective franchisee during pre-approval negotiations).

3. *The district court's analysis*

The district court, in denying the motion to dismiss, relied on the statutory provision allowing for a finding of a duty to disclose because of the particular circumstances of the case.[46] The district court based its denial of the motion to dismiss on pleadings of facts made in a light most favorable to the Williams. Those factual allegations were:

> (1) Plaintiffs were in the process of negotiating for the purchase of Tri-Star,[47] with whom Defendant had for a number of years had a franchise relationship; (2) Plaintiffs' decision to purchase Tri-Star was in large part based upon the assumption that Plaintiffs' own proposed franchise relationship with Defendant would continue basically unchanged from that previously exercised by Defendant and Tri-Star; (3) Plaintiffs had specifically sought reassurances from Defendant that this would be the case, and had themselves taken a number of investigative steps to assure themselves of this fact; and (4) absent disclosure by

---

[42]*Williams,* 795 F.Supp. at 1148.

[43]*See id.*

[44]*See Butts v. Southern Clays, Inc.,* 215 Ga.App. 110, 450 S.E.2d 244, 247 (Ga.App.1994).

[45]12 F.3d 1464, 1472 (9th Cir.1993).

[46]*Williams,* 795 F.Supp. at 1150.

[47]In this quoted section of the district court order, "Tri-State" was incorrectly referred to as "Tri-Star."

11

Defendant, Plaintiffs had virtually no way of discovering for themselves the fact of the imminent joint venture agreement between Defendant and Komatsu.[48]

The district court's pre-trial denial of the motion to dismiss because of the particular circumstances, based on these facts, was correct. However, the evidence adduced at trial did not support these allegations, as discussed in the following section. While the denial of the motion to dismiss was proper on this issue in light of those factual assumptions, the denial of the motion for judgment notwithstanding the verdict was in error.

B. *The duty of due diligence and reliance on the representations*

Georgia law imposes on a plaintiff a duty of due diligence that must be exercised.[49] The law will not give relief to a party who suffers because they did not use the "ordinary means of information, whether the neglect is due to indifference or credulity."[50] There is no legal relief afforded when one "blindly relied on the representations of the [other party] as to matters of which he could have informed himself."[51] A party cannot rely on representations consisting of "general commendations or mere expressions of opinion, hope, expectation, and the like."[52] Georgia courts have consistently held that a party "is bound to make inquiry and examination for himself so as to ascertain the truth."[53] Further, one who relied upon the representations of another must have used

---

[48]*Id.*

[49]*Lorick v. Na-Churs Plant Food Co.,* 150 Ga.App. 209, 210, 257 S.E.2d 332 (1979).

[50]*Saffar v. Chrysler First Business Credit Corp.,* 215 Ga.App. 239, 450 S.E.2d 267, 271 (Ga.App.1994).

[51]*S. Intermodal Logistics v. Smith & Kelly Co.,* 190 Ga.App. 584, 379 S.E.2d 612 (Ga.App.1989).

[52]*Charter Medical Management Co.,* 283 S.E.2d at 336.

[53]*Miller v. Clabby,* 178 Ga.App. 821, 822, 344 S.E.2d 751 (Ga.App.1986) (citations omitted). *See, e.g., Doe v. Prudential-Bache/A.G. Spanos Realty Partners,* 222 Ga.App. 169, 176, 474 S.E.2d 31, 37 (Ga.App.1996)(apartment tenant who was attacked in the apartment garage had no valid fraud claim against apartment manager who told her the garage was secured because she failed to independently investigate whether the garage was secure); *Randall v. Smith,* 136 Ga.App. 823, 825, 222 S.E.2d 664 (Ga.App.1975) (no valid fraud claim for used car purchaser who relied on salesman's statements that car was in good condition, suitable for driving, and that salesman would "stand behind the car"); *Shivers v. Sweda Int'l, Inc.,* 146 Ga.App. 758, 247

the means available to him, in the exercise of diligence, to discover the truth.[54] While the question of due diligence is also generally resolved by the trier of fact,[55] one may fail to exercise due diligence as a matter of law.[56] Where the party complaining of fraud fails to exercise any due diligence to discover the truthfulness of representations, there is no jury question.[57]

In *So. Intermodal Logistics v. Smith & Kelly Co.,*[58] the plaintiffs were in the business of hauling containerized cargo from southern ports to inland destinations.[59] The plaintiffs brought suit against an agent for shipping lines, alleging that the agent committed fraud by failing to inform them that a customer the agent had lined up for the plaintiff had not paid its previous hauling company.[60] The court found that the plaintiff did not exercise due diligence because the customer's financial difficulties were well known in the shipping industry, the plaintiffs made no inquiries regarding the customer's financial status, reviewed no industry publications, and consulted no credit information services.[61] The court found that "[t]he entire record is devoid of the slightest evidence that appellant

---

S.E.2d 576, 577 (Ga.App.1978)(no valid fraud claim where purchaser of computer did not investigate salesman's claims that salesman would procure a particular company as a client for purchaser); *U-Haul of Western Ga. v. Dillard Paper,* 169 Ga.App. 280, 312 S.E.2d 618, 620 (Ga.App.1983)(purchaser of building had no valid fraud claim against seller for defects in building because of purchaser's failure to employ a structural engineer to inspect property before purchase).

[54]*Blanchard v. West,* 115 Ga.App. 814, 815, 156 S.E.2d 164 (Ga.App.1967).

[55]*Hill v.Century 21 Max Stancil Realty, Inc.,* 187 Ga.App. 754, 371 S.E.2d 217 (Ga.App.1988).

[56]*See Bowen & Bowen Inc. v. McCoy-Gibbons, Inc.,* 185 Ga.App. 298, 303, 363 S.E.2d 827 (Ga.App.1987).

[57]*Charter Medical Management Co. v. Ware Manor, Inc.,* 159 Ga.App. 378, 283 S.E.2d 330, 336 (Ga.App.1981).

[58]190 Ga.App. 584, 379 S.E.2d 612 (Ga.App.1989).

[59]*Smith & Kelly Co.,* 379 S.E.2d at 613.

[60]*Id.*

[61]*Id.* at 614.

exercised any diligence or even ordinary care in ascertaining [the customer]'s true status before entering into the hauling agreement."[62]

It is clear from the record that the Williams failed to exercise any due diligence, or even ordinary care, in ascertaining Dresser's financial status or condition before purchasing Tri-State. Specifically, John Williams testified that he did not ask his stockbroker at any time before acquiring Tri-State to get information for him about Dresser, did not contact Dresser directly for information on the company or consult an industry expert, and conducted no research on what customers desired from a heavy construction equipment distributorship. Jay Williams testified that he did not consult an industry expert or evaluate Dresser in any way, nor did he obtain copies of Dresser's recent annual reports. The Williams conducted a thorough due diligence analysis of Tri-State, but Tri-State is not a party to this action. Just as the *So. Intermodal Logistics* plaintiffs' failure to seek out industry information was a lack of due diligence, the Williams' failure to investigate the available industry information on Dresser's financial status and joint venture plans constitutes a failure to exercise due diligence.

The Williams argue that the information about the joint venture with Komatsu was not equally available to both parties because of the confidentiality agreement, and thus, they had no duty of due diligence. John Williams testified that he would not have bought Tri-State had he known that Dresser was getting ready to enter into a joint venture. While it is true that the information regarding *who* Dresser might have been considering as a joint venture partner was not equally available, the general information that Dresser was searching for a joint venture partner was available. A witness for the Williams, the executive vice president of a materials company, testified that he knew of rumors in the industry about Dresser and its limited longevity due to the consolidations occurring worldwide. The Williams' expert, an industry analyst, testified that there were rumors in the industry that Dresser was seeking out various companies as potential joint venture partners. The expert also testified that he published a report in 1986 observing that Dresser

---

[62]*Id.*

14

needed to change, and that had the Williams consulted him, he would have told them that Dresser had talked with a "number of companies" about the possibility of a merger. Dresser's 1986 annual report contained the statement that they would need to "continue to innovate and restructure." The expert's testimony that he was "shocked and surprised" that the joint venture was with Komatsu is not significant. The information that Dresser was seeking a joint venture was available to the Williams even if the information about whom the joint venture partner might be was not available.

In *Mail & Media, Inc. v. Rotenberry,*[63] Mr. Rotenberry, the sole owner of a company called Mail & Media, Inc. ("M & M"), sold M & M to another company. Rotenberry was retained as an employee for three years after the sale, but died during the second year.[64] Rotenberry's wife brought suit against M & M, and M & M counterclaimed that Rotenberry breached fiduciary duties to M & M by not informing M & M's purchaser of the existence of a reserve account for its largest customer, which ultimately resulted in the loss of the customer's business.[65] The Georgia court found that Rotenberry, as seller, owed no fiduciary duty to the purchaser during the time they negotiated the sale of M & M, and that the purchaser's employees were aware of the existence of the reserve account but failed to conduct a thorough due diligence inquiry.[66] Although the purchaser's employees asked some questions about the account that were not fully answered, they did not press for complete disclosure, and "willingly entered into the purchase agreement with nothing more than assurances" from the customer that the relationship between the customer and the company was strong.[67]

The Williams also argue that their direct inquiry to Dresser representatives during the meeting in Chicago constituted due diligence. John Williams testified that he asked Wesley Lee

---

[63]213 Ga.App. 826, 446 S.E.2d 517 (Ga.App.1994).

[64]*Rotenberry,* 446 S.E.2d at 518.

[65]*Id.* at 519-520.

[66]*Id.* at 520.

[67]*Id.*

15

about future plans for the machinery business and what Dresser planned to do about expanding their line. Jay Williams testified that he asked Lee if the relationship [between Tri-State and Dresser] would continue as it had been. They testified that Lee responded that Dresser would be adding engineers and modernizing their equipment, and that the relationship with Tri-State would remain as it had been. Jay Williams testified that he knew that there were "joint ventures going on all the time in this industry." Despite the fact the information that Dresser had been seeking a joint venture partner was available, the Williams failed to inquire into the company's plans regarding a joint venture. Like the purchaser's questions in *Mail & Media, Inc.,* John and Jay Williams' general and vague questions about the company's future do not constitute due diligence. The Williams' attempt to frame their queries to Dresser as a "direct inquiry" is not persuasive.

## III. FEDERAL SECURITIES LAW

Federal securities law is not controlling in this case, but it is analogous. Under Rule 10b, the Securities and Exchange Commission has made it unlawful for any person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security."[68] The Supreme Court has held that a duty to disclose is the element required to make silence fraudulent, and that duty does not exist absent a fiduciary relationship or other similar relationship of trust and confidence.[69]

A duty to disclose does not arise from the mere possession of nonpublic information, but rather from the existence of a fiduciary relationship.[70] In *Chiarella,* the Supreme Court found that a purchaser of stock has no duty to a prospective seller because there is no fiduciary relationship.[71]

---

[68]Securities and Exchange Commission's Rule 10b-5, 17 C.F.R. § 240.10b-5 (1987).

[69]*Chiarella v. United States,* 445 U.S. 222, 232, 100 S.Ct. 1108, 1116-17, 63 L.Ed.2d 348 (1980).

[70]*Dirks v. S.E.C.,* 463 U.S. 646, 654, 103 S.Ct. 3255, 3261, 77 L.Ed.2d 911 (1983) (citation omitted).

[71]*Chiarella,* 445 U.S. at 229, 100 S.Ct. at 1115.

16

In the context of sales of stock while negotiations for merger or acquisitions were pending, courts have found no duty to disclose the negotiations. *See, e.g., Glazer v. Formica Corp.*[72] (no duty to disclose the existence or status of negotiations for leveraged buyout to stockholders); *Jackvony v. RIHT Financial Corp.,*[73] (no duty to disclose information about upcoming acquisition to a stockholder); *Taylor v. First Union Corp. of South Carolina,*[74] (corporation's silence was not misleading or material because it had no duty to stockholder to disclose information about preliminary negotiations with foreign corporation). As established above, the Williams had no fiduciary relationship with Dresser and no interest in Dresser prior to their request to purchase the distributorship. Dresser owed no duty to disclose the negotiations with Komatsu to the Williams, and thus, no liability could attach.

## IV. CONCLUSION

In establishing a claim for fraudulent concealment, a plaintiff must prove that the defendant had a duty to disclose the concealed facts. The Williams did not establish that they had a confidential relationship with Dresser or that the circumstances created a duty to disclose; moreover, they failed to exercise due diligence in investigating Dresser's general representations of well-being. Because we find that the Williams failed to carry their burden of proving an essential element of fraud under Georgia law, we need go no further to address the remaining arguments. Likewise, we need not address the Williams' cross-appeal of the district court's jury instructions and the appellee's post-judgment motion to strike the appellants' submission of supplemental authority regarding the issue of damages. The district court should have granted Dresser's motion for judgment as a matter of law, and the judgment is REVERSED.

---

[72]964 F.2d 149, 157 (2d Cir.1992).

[73]873 F.2d 411, 417 (1st Cir.1989)

[74]857 F.2d 240, 243-44 (4th Cir.1988), *cert. denied,* 489 U.S. 1080, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989).