GE LIFE AND ANNUITY
ASSURANCE COMPANY,
Plaintiff,

v.

Sara G. BARBOUR and the Estate of
Robert F. Barbour, Defendants/Coun-
terclaim Plaintiffs.

No. 5:01CV85–4(WDO).

United States District Court,
M.D. Georgia,
Macon Division.

March 6, 2002.

Frank Cater Jones, Charles K. McKnight, Jr., King & Spalding, Atlanta, GA, Robert C. Norman, Jr., Howard Jerome Strickland, Macon, GA, Charles C. Platt, Randall M. Fox, LeBoeuf, Lamb, Green & MacRae, LLP, New York City, John W. Woods, Jr., Washington, DC, for GE Life and Annuity Assurance Company.

Gary C. Christy, Cordele, GA, Stanley L. Merritt, Jr., Jason Lance Crawford, Columbus, GA, Hardy Gregory, Jr., Preyesh K. Maniklal, Cordele, GA, Gary O. Bruce, Columbus, GA, Kice H. Stone, Macon, GA, Jonathan H. Waller, Birmingham, AL, for Sara G. Barbour, the Estate of Robert F. Barbour.

## ORDER

OWENS, District Judge.

This case filed pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, is before the Court on the following motions:

1. Defendants' Motion to Dismiss/Motion for Summary Judgment [Tab 7 and 41];
2. Plaintiff's Motion for Summary Judgment on Defendants' Counterclaims [Tab 34];
3. Plaintiff's Motion to Strike Plaintiff McBride and Counterclaim Plaintiff's Statement [Tab 55]; and
4. Plaintiff's Motion to Strike the Affidavits and Reports of Purported Expert Tim C. Ryles [Tab 52].

Because the Motion to Dismiss has been converted into a Motion for Summary

Judgment, it will now be analyzed under Federal Rule of Civil Procedure 56 and applicable case law. Defendants Sara Barbour and the Estate of Robert Barbour (hereinafter "The Barbours" or, collectively, "The Defendants") requested the Court to incorporate into this case certain portions of the briefs and exhibits filed in the related *McBride* case. *See* Tab 41. For the areas in which those materials are applicable to these Defendants, they are adopted and made a part of the Barbours' case.

### I. Factual and Procedural History

On November 4, 1981, GE issued a life insurance policy to Sarah Barbour and her late husband Robert Barbour through its agents James L. Cooper and Tom Wagoner[1]. *See* Compl. at Ex. A; Tab 38, Ex. 2 & 4; Tab 40; and Tab 41. The policy provided for $200,000 in death benefits for the named insured Robert Barbour. *See* Tab 38, Ex. 2. The policy was initially funded with approximately $30,000 of the Barbour's money. *Id.* Part of the initial funding was allegedly from money the Barbour's received when they cashed in two $50,000 whole life policies with other companies. The initial monthly premium was approximately $560.

Before Robert's death, the couple changed the policy coverage and premium because they could no longer afford the $560 per month. The coverage was decreased to $100,000 on or about January 4, 1988 with a $250 monthly premium and eventually decreased to $25,000. *Id.* At some point, the premium was reduced to $218 per quarter. The record reflects that on or about December 2, 1986, $18,000 was withdrawn from the policy although Ms. Barbour testified she did not know the money had been withdrawn until this was pointed out to her in her deposition. *See*

---

1. The policy is attached to Tab 38, Ex. 11 & 12.

S. Barbour Depo. at 88–90 (Tab 38, Ex. 3 & 7).

In February of 1982, the ownership of the policy was transferred to Sara Barbour but Robert remained the named insured. Sara Barbour testified they paid approximately $77,000 in premiums from 1981 until 1991. *Id.* In 1991, when Robert died, Sara received only $25,076.57 from his policy. The Barbours' Counterclaim for fraud and RICO violations is based on the following: (1) that the Barbours paid more than $77,000 into a policy that only paid $25,076 upon Robert's death, (2) that the policy did not "carry itself", or, fund itself through interest payments as warranted by the GE agents and (3) that the policy was represented as worth the 'cash value' and not the 'face value.' *See* S. Barbour Depo. at 48–49, 57 (Tab 38, Ex. 3).

The evidence shows that GE marketed these policies to consumers like Defendants who had existing policies the cash value of which could be used to purchase the new policy. *See* Tab 49. A fee was taken out of the cash value in existing policies and was transferred into the new policy. Defendants contend this fee was never disclosed to them or to other consumers. The Barbours were told the interest on the new policy would fund the policy in the future. If interest rates fell, the cash value of the policy would diminish but this was not disclosed in the policy. The agents allegedly advertised the policy as an investment or savings instrument which would pay interest to the account from which insurance premiums would be paid. Defendants contend the effect a drop in interest rates would have on the policy was never explained or disclosed in any way. Sara Barbour stated she does not know if they ever received a buyer's manual that more fully explains the policy. *See* S. Barbour Depo. at 74, Tab 38, Ex. 3.

The administration of the policy is best explained by GE's designated corporate representative, Bruce Booker. Booker is the Vice President for Business Development of GE. *See* Depo. of Booker at 11:19–20. Part of Booker's responsibilities includes product design, actuarial projections and pricing projections. *Id.* at 13–16. In his deposition,[2] Booker explained how the company priced the policies. He explained the company made projections on how interest rates were going to affect the cost of the policies and thus the cash value of the policies. *Id.* at 38–59. The cash value is almost entirely dependent on interest rates remaining stable for 20 to 30 years. The Barbour's policy was to remain in force until 2008—27 years. Mr. Booker testified that "I don't believe there is ever any reason or requirement to assume that either current interest rates or credited interest rates would remain at any particular level for 30 years." *Id.* at 81:17–20. In fact, Booker stated, "I believe that the actuarial principles would—would require that the actuary not make assumptions that depend on the interest rate being unchanging over a long period of time." *Id.* at 98:6–9.

Although Booker was testifying with McBride's policy as an example, his testimony is applicable in this case because a similar policy is in dispute. McBride's policy had a slightly higher interest rate—9.71%. Booker stated that, in the unlikely event the interest rate remained at or around that rate, McBride's policy would still lapse in year 13 [1999] if he continued to pay only the agreed upon premium of $151. *Id.* at 100:4–21. In fact, Booker clarified the "initial planned premium, periodic premium, would not be sufficient to have the policy last until . . . 2028." *Id.* at 100:22–24. Accordingly, "the monthly premium would have to increase to maintain

---

2. Attached as Exhibit 6 to the Collective Notice of Filing Evidentiary Material at Tab 49.

the policy in force." *Id.* at 101:8–11. Likewise, this testimony shows the Barbour policy would have lapsed much sooner than 2008 based on the initial interest rate, initial planned premium and cash value factors. Notably, from a review of the record, this information is found nowhere in the policy or any accompanying material provided to the Barbours at the time they purchased their policy.

On October 12, 1999, Ms. Barbour submitted an affidavit in another case alleging she and her husband had been defrauded when they purchased their policy. *See* Tab 21 at Ex. 1. Ms. Barbour was deposed in another related case on March 27, 2000 [3]. In this deposition, she indicated her potential claims against GE for the allegedly fraudulent insurance policy. On November 17, 2000, counsel for Defendants notified GE of their intention to file suit on behalf of the Barbours within two weeks. Based on the foregoing, Plaintiff filed the instant Declaratory Judgment action and asked the Court to find the contract valid and enforceable as written. Defendants filed a Counterclaim alleging violations of Georgia's RICO Act and claims for fraud and deceit based on the confusing and misleading nature of how the policy was administered and valued. Defendants contend the policy language as written is not readily understandable and the policy was not administered as the agents represented during the sale of the policy.

## II. Motions to Strike

GE has moved to strike a document filed by the Barbours and the other Counterclaim Plaintiff's in this and the other four related cases. The document is entitled "Plaintiff McBride and Counterclaim

Plaintiff's Statement." *See* Tab 43. It is essentially a response by the Barbours and the other Counterclaim Plaintiffs to GE's statement of material facts not in dispute filed in support of GE's summary judgment motion. GE contends the Statement is neither contemplated nor required by Rule 56. The Barbours contend they filed the Statement only in an abundance of caution to ensure full compliance with Rule 56. The Barbours and the other Counterclaim Plaintiffs have stipulated to withdraw any portion of the Statement not in compliance with the Rules. Further, they indicated they did not anticipate any response from GE to the Statement.

The parties have had ample opportunity to address the issues contained in the Statement during the January 16, 2002 hearing and in the numerous briefs that have been filed. Because all the information contained therein has already been addressed in some form, there is no harm or prejudice in admitting the same. More important, the Court has addressed the five related cases collectively for the past year. Therefore, it was not inappropriate for the Barbours and the counterclaim Plaintiff's to file a joint statement of material facts. Accordingly, the **Motion to Strike the "Plaintiff McBride and Counterclaim Plaintiff's Statement" is hereby DENIED.**

GE also moved to strike the Affidavit and Report of Purported Expert Tim C. Ryles.[4] GE contends the purported expert opinions do not satisfy the standards set in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This Court adopts the reasoning of another judge of

---

3. *See* Tab. 38, Ex. 13.

4. Attached as Exhibits 11 and 12 to Tab 49, the "Collective Notice of Filing Evidentiary Materials and Submission of Exhibits In Op-

position to Life of Virginia's Motions for Summary Judgment." The Report is attached to Tab 51 as "Defendant's Disclosure of Expert Testimony."

this Court that after a full hearing on the matter addressed the admissibility of this same expert's opinion. *See Tidwell v. Allstate Ins. Co.*, No. 1:96–CV–189–1 (M.D.Ga. Apr. 4, 2000)[5]. In *Tidwell*, the court held, "Dr. Ryles has an extensive basis upon which to base his testimony and hence Ryles' testimony regarding the standard of care in the industry ... has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Id.* at *4 (citing *Kumho Tire*, 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). As recognized in *Tidwell*, Ryles' opinion is "based more on his knowledge and experience rather than on scientific matters which were the subject of *Daubert.*" *Id.* Therefore, the reports and affidavits of Ryles are admitted.

The opinions are not admitted to decide the ultimate, dispositive issues in this case—the actual legal interpretation of the contracts. Rather, Ryles' expert opinion will be used to explain the complex nature of the contracts and the terms and concepts contained therein. Because that information is relevant to the issues before the Court, appears to be in compliance with Federal Rule of Civil Procedure 702 and GE has been able to respond to the Affidavit, it will not be struck from the record. Accordingly, the **Motions to Strike the Opinions, Affidavits and other filings pertaining to Expert Tim Ryles are DENIED** and GE's request for further oral argument on this issue is DENIED.

### III. Summary Judgment Standard

Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c). "Moreover, the moving party has the burden of meeting this exacting standard." *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1369 (11th Cir.1997) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Applying this standard, the Eleventh Circuit explained:

> In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. All reasonable doubts about the facts should be resolved in favor of the non-movant. If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly supported the motion with sufficient evidence. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever.

*Id.* (internal citations omitted). In this case, summary judgment is not appropriate if the parties agree on the basic facts—that there was a life insurance policy issued to the Barbours by GE in 1981—but disagree about the inferences that should be drawn from these facts—whether the

---

5. The hearing transcript is attached as Exhibit A to Tab 62.

contract is fraudulently vague, ambiguous or misleading and whether GE committed fraud when its agents failed to disclose material information about the contract.

## IV. Statutes of Limitation

### A. Fraud Claims

■■■ The statute of limitations for fraud claims in Georgia is four years. O.C.G.A. § 9–3–31. Actual fraud tolls the statute of limitations where it is the gravamen of the action before the court. *Shipman v. Horizon Corp.*, 245 Ga. 808, 267 S.E.2d 244, 246 (1980). "Where the basis of an action is actual fraud, the mere silence of the party committing it is treated as a continuation of the original fraud and as constituting a fraudulent concealment, and the statute of limitations does not begin to run against such right of action until such fraud is discovered, or could have been discovered by the exercise of ordinary care and diligence." *Id.*, 267 S.E.2d at 246. *See also Coffee v. General Motors Acceptance Corp.*, 30 F.Supp.2d 1376, 1381 (S.D.Ga.1998)(citing *Shipman* )(actual fraud where defendant intentionally deceives by false representation or by concealment of a fact which has the effect of barring and deterring plaintiff from his action). Moreover, where the gravamen of an action is actual fraud, failure to exercise reasonable diligence to discover the fraud may be excused if a relationship of trust and confidence exists between the parties. *Shipman*, 267 S.E.2d at 246. In such situations, this is a mixed question of law and fact that is more appropriately submitted to a jury. *Therrell v. Georgia Marble Holdings Corp.*, 960 F.2d 1555 (11th Cir.1992).

■■■ The Barbours contend there was actual fraud in the procurement of the life insurance policy in question. The statute of limitations would not have begun to run in this case until Ms. Barbour discovered the premium structure and cash value concepts were fraudulently represented to her at the time of sale. Although in most cases the limitations period could also begin to run when the Barbours could reasonably have discovered the alleged fraud, in this case there was possibly a confidential relationship between the selling agents and the Barbours. Such relationship would relieve Ms. Barbour, or Mr. Barbour during his lifetime, of actively pursuing the claims now raised in this case. Therefore, the Barbours could not have discovered the alleged fraud until some time in 1998 or possibly even 1999 when Ms. Barbour was contacted by her attorney about the policies sold to the other Counterclaim Plaintiffs. Ms. Barbour submitted a sworn affidavit in a related case on October 12, 1999 alleging the claims set forth in this case [6]. The best estimate of when the fraud was discoverable would have been some time prior to that. Before Ms. Barbour was contacted by her attorney, she had no way of knowing the true nature of the policy she had purchased. The statute of limitations would not have run then until some time in 2003. The Counterclaim was filed on July 25, 2001. Defendants have presented sufficient evidence to create a material issue of fact regarding when they received the requisite notice that would have caused the statute of limitations to begin to run.

### B. Georgia RICO Claims

The statute of limitations for Georgia RICO claims is five years. O.C.G.A. § 16–14–8. The Georgia Code provides that "a criminal or civil action or proceeding under this chapter may be commenced up until five years after the conduct in violation of a provision of this chapter terminates or the cause of action accrues." *Id.* Because Defendants created a material issue of fact

---

6. *See* Tab 21, Ex. 1.

regarding the statute of limitation on their fraud claim, there remains a question of fact on the issue of whether Georgia's RICO statute of limitation is applicable.

## V. Substantive Claims

### A. Declaratory Judgment Act

■ GE originally filed its Complaint seeking a declaratory judgment that the policy is the complete agreement between the parties and that nothing in the policy guaranteed the policy would always remain in force or that premiums would never increase. The Declaratory Judgment Act is found at 28 U.S.C. § 2201 *et seq.* There is support in prior precedent that a suit pursuant to this statute is the appropriate method to determine the validity of a contract. *State Farm v. Bates*, 542 F.Supp. 807 (N.D.Ga.1982) (insurance company sought determination of its liabilities under various insurance contracts); *see also Sears, Roebuck & Co. v. American Mut. Liability Ins. Co.*, 372 F.2d 435 (7th Cir. 1967) (the Act affords relief from uncertainty and insecurity with respect to legal relations); *Hardware Mut. Casualty Co. v. Schantz*, 178 F.2d 779 (5th Cir.1949) (Act's purpose is to prevent suits); *Friedman v. Geller*, 925 F.Supp. 611 (E.D.Wis.1996) (threat of suit makes a justiciable controversy). In *Bates*, the court held, "Federal courts long have held that an insurance company seeking determination of its liabilities under an insurance contract could utilize the Declaratory Judgment Act for such a purpose." *Bates*, 542 F.Supp. at 817. To proceed with a Declaratory Judgment Act claim, there must be (1) an actual issue in controversy as opposed to one that is hypothetical or contrived, (2) the case must not be the medium for securing an advisory opinion, (3) the matter must be definite and concrete, (4) the parties' positions must be defined and adversarial and (5) the issues must be susceptible to judi-

cial determination. *Id.* All of these elements are met in the case at bar.

■ This case involves a life insurance policy issued on Robert Barbour. On October 12, 1999, Ms. Barbour submitted an affidavit in another case stating she and her husband had been defrauded when they purchased the policy. In March of 2000, Ms. Barbour gave her first deposition testimony regarding the claims in this case. In November of 2000, GE received notice of the Barbours' intent to file a Complaint against GE. Further, because there are questions of fact regarding the substantive claims in this case as more thoroughly addressed below, there are actual issues in controversy sufficient to proceed under the Declaratory Judgment Act. Accordingly, Defendants' **Motion for Summary Judgment** as to this Court's lack of jurisdiction to consider the Declaratory Judgment action is **DENIED.**

### B. Fraud and Concealment Claim

#### 1. Prima Facie Case of Fraud

■ To state a claim for fraudulent misrepresentation under Georgia law a plaintiff must prove five essential elements: (1) that the defendant made representations; (2) that defendant knew the representations were false; (3) that these representations were made intentionally and for the purpose of deceiving the plaintiff; (4) that plaintiff reasonably relied on these representations; and (5) that as a proximate result of the misrepresentations plaintiff incurred damages. *See* O.C.G.A. § 23–2–52; *Williams v. Dresser Indus., Inc.*, 120 F.3d 1163, 1167 (11th Cir.1997). "Georgia law further provides that 'suppression of a material fact which a party is under an obligation to communicate constitutes fraud.'" *Id.* (citations omitted).

■ "The obligation to communicate may arise from the confidential relations of

the parties or from the particular circumstances of the case." *Id.* "An obligation to disclose must exist before a party may be held liable for fraud based upon the concealment of material facts." *Id.* "In cases where Georgia courts have found the existence of a confidential relationship in business, the parties have had either a history of business dealings with each other or the kind of relationship that is not armslength, such as a partnership or principal and agent." *Id.* at 1168. "However, Georgia courts have recognized that even though the parties were acquainted as friends or business associates prior to a business transaction, a confidential relationship is not automatically established." *Id.* The "existence of a confidential relationship depends upon the circumstances and therefore is generally a jury issue." *Id.* "Where one person sustains towards another a relation of trust and confidence, his silence when he should speak or his failure to disclose what he ought to disclose constitutes fraud in law just as do actual affirmative false representations." *Tigner v. Shearson–Lehman Hutton, Inc.,* 201 Ga.App. 713, 411 S.E.2d 800, 802 (1991) (citations omitted). O.C.G.A. § 23–2–58 defines a confidential relationship as one "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another." In *Tigner,* the court held there was a confidential relationship when a broker undertook an obligation to manage the plaintiff's financial investments. However, in *Stewart v. Boykin,* the Georgia Court of Appeals held that where an insurance agent was not the employee of the insurance company, the existence of a fiduciary relationship between the agent and the insured was a question for the jury. *Stewart v. Boykin,* 165 Ga.App. 868, 303 S.E.2d 50 (1983). *See also Dominick,* 809 F.2d at 1570–71(duty of fair dealing and to disclose material facts where insured in inferior bargaining position to agent). Based on

this guidance, the issue of whether there was a duty to disclose the material terms and conditions of the policy to the Barbours is more appropriately a question for the jury.

### 2. Affirmance v. Rescission

When a party seeks to prove he was fraudulently induced by misrepresentations into entering a contract, "he can affirm the contract and sue for breach or seek to rescind and sue in tort for fraud and deceit." *Carpenter v. Curtis,* 196 Ga. App. 234, 395 S.E.2d 653, 655 (1990) (citations omitted). "Affirmance of the contract by the defrauded party does not necessarily deprive him of the right to sue for damages for fraud, as the right to affirm and the right to fraud damages coexist. However, he must do nothing to waive the fraud." *Id.* Waiver may be accomplished by actually affirming the contract, by waiting too long to bring an action on the contract and thus constructively affirming the contract or in some instances by a merger clause that is not itself voidable because of fraud. *See generally Id.* A merger clause can be defeated under certain circumstances such as where there is evidence the transaction in question was not an arm's length transaction between professionals or there was a duty to disclose between the parties. *Kobatake v. E.I. DuPont De Nemours and Co. et al.,* 162 F.3d 619, 626 (11th Cir.1998) (citation omitted). If rescission of the contract is no longer a viable option, a plaintiff must proceed under the contract and seek any damages to which he is entitled. *Carpenter,* 395 S.E.2d at 656.

One case specifically addressing insurance policies stated "courts should be concerned with assuring that the insurance purchasing public's reasonable expectations are fulfilled." *Benevento v. Life USA Holding, Inc.,* 61 F.Supp.2d 407, 418

(E.D.Pa.1999)(annuity case where insureds claimed fraud in the sale of the policy). "Regardless of the ambiguity (or lack thereof) inherent in a given set of insurance documents (whether they be applications, conditional receipts, rider, policies, etc.), the public has a right to expect that they will receive something of comparable value in return for the premium paid." *Id.* (citations omitted). "Thus, where an individual applies and pays for specific insurance coverage, the insurer may not unilaterally change the coverage or issue a policy differing from what the insured requested and paid for without affirmatively showing that the insured was notified or, and understood the change, regardless of whether the insured read the policy." *Id.* (citation omitted). *See also Greenberg v. Life Insurance Company of Virginia,* 177 F.3d 507 (6th Cir.1999)(interpreting a similar contract pursuant to similar Ohio law and finding the contract sufficiently ambiguous, vague and misleading to reverse trial court's dismissal for failure to state a claim).

■■■ The most pertinent statement of Georgia law is that: "Concealment of material facts may amount to fraud when direct inquiry is made, and the truth evaded, or where the concealment is of intrinsic qualities of the articles which the other party by the exercise of ordinary prudence and caution could not discover." *Rivers v. BMW of North America, Inc.,* 214 Ga.App. 880, 449 S.E.2d 337 (1994).[7] This statement of law is taken from a jury instruction in fraud cases involving vehicles sold to consumers who were misled into purchasing a product that was not as represented by the seller. This principle is also applicable where insureds have been fraudulently induced into parting with thousands of dollars to purchase a life insurance policy that was materially different from what was represented by the company. Based on this precedent, Defendants are not estopped from asserting both fraud and breach of contract in their Counterclaim.

### 3. Parol Evidence Rule and Related Issues

■■■■ In support of the Barbours' claim that they were fraudulently induced into signing and maintaining the policy in question, they filed various documents, affidavits and briefs containing information that GE contends violates the Parol Evidence Rule. As a matter of general contract construction, a contract containing a "merger" clause indicates a complete agreement between the parties that may not be contradicted by extraneous material. However, in the case of fraud, extraneous material may sometimes be admitted. "False and fraudulent representations as to an existing fact which induced the signing of a sales contract give the purchaser the right to rescind the contract." *Crews v. Cisco Bros. Ford–Mercury, Inc.,* 201 Ga.App. 589, 411 S.E.2d 518, 519 (1991) (citations omitted)(concerned buyers of used vehicles sued dealer for fraud after learning the vehicles had been previously wrecked). "One who seeks rescission of a contract for fraud must restore or offer to restore the consideration received thereunder, as a condition precedent to bringing the action." *Id.* (citation omitted). "[H]owever, restoration by the purchaser is not an absolute rule, and does not re-

---

**7.** The Court notes that *Life Ins. Co. of Virginia v. Conley* relied upon by GE does not appear to be the current state of the law in Georgia regarding fraudulent inducement to purchase a life insurance contract. *Life Ins. Co. of Virginia v. Conley,* 181 Ga.App. 152, 351 S.E.2d 498 (1986). Although *Conley* interpreted a similar contract with GE, subsequent case law indicates a different approach than the one taken in *Conley* that would result in a complete miscarriage of justice to the insured.

quire that the defrauding part be placed in exact status quo, but only that he be placed substantially in his original position and that the party rescinding derives no unconscionable advantage from the rescission." *Id.* (citations omitted). The defrauded party need not offer to restore where the defrauding party has made restoration impossible or when to do so would be unreasonable. *Id.* (citations omitted). This rule can only be applied when it is equitable. *Id.*, 411 S.E.2d at 520. It "was not meant to give the defrauding party an advantage at the expense of the defrauded purchaser." *Id.*

With this general guidance in mind, the analysis can proceed to the underlying issues. As to the merger clause, "questions of reliance on the alleged fraudulent misrepresentation in tort cases cannot be determined by the provisions of the contract sought to be rescinded but must be determined as a question of fact for the jury." *Id.* (citing *City Dodge v. Gardner*, 232 Ga. 766, 208 S.E.2d 794 (1974)). "It is inconsistent to apply a disclaimer provision of a contract in a tort action brought to determine whether the entire contract is invalid because of alleged prior fraud which induced the execution of the contract." *Id.* "If the contract is invalid because of the antecedent fraud, then the disclaimer provision therein is ineffectual since, in legal contemplation, there is no contract between the parties." *Id.* at 520–21 (citation omitted). "Parol evidence showing fraud in the inducement is admissible even though the written contract says the entire agreement of the parties is contained therein." *del Mazo v. Sanchez*, 186 Ga.App. 120, 366 S.E.2d 333, 337 (1988). Evidence of fraudulent inducement is sufficient to raise an issue thereby precluding summary judgment on the issue of fraud. *Id.* "Questions of fraud, the truth and materiality of representations made by a seller, and whether the buyer could have protected himself by the exercise of proper diligence are, except in plain and indisputable cases, questions for the jury." *Id.* (citations omitted).

The Barbours assert claims for fraud and concealment based on an insurance policy. They contend the policy in question omitted material information the lack of which was the direct and proximate cause of their damages. The Barbours contend there were misrepresentations regarding the duration of coverage, the type of coverage, the duration and type of premiums and other important information vital to a complete understanding of the policy. This was all part of an allegedly fraudulent scheme to obtain money from the Defendants by means of false pretenses, misrepresentations and promises with the intent to deprive them of that money and property.

The policy provided for an interest rate of 7.4%. The maturity date of the policy was 2008 or 27 years after the inception date. The Barbours were allegedly assured the policy would "carry itself" due to the interest that would build up on the policy. The cash value would diminish however if interest rates dropped but this was not disclosed in the policy. Bruce Booker testified that GE's calculation in determining the policy's initial premium was based on interest rates remaining the same for 20–30 years. It is preposterous to assume that interest rates would remain constant or anywhere near the same ballpark for three decades. However, this is not made clear anywhere in the policy. It is absurd to expect the Barbours to have understood the ramifications of the financial market on their insurance policy. Ms. Barbour testified that she nor her husband would be able to understand the policy even if they read it "all day."[8] Indeed, the policy does not contain any sort of

---

8. *See* S. Barbour Depo. at 72 (Tab 38, Ex. 3).

clear explanation of the circumstances under which the premiums would increase or decrease, of what the true meaning of cash value is in relation to the continuation of the policy or of how insureds could avoid the lapse of their policy. There are places where terms of art are defined or where a number is stated such as the then-current interest rate or the illustrative interest rate. These terms or phrases are not explained though in relation to how these concepts affect the policy.

The Policy Data Sheet provided for a "scheduled premium" that was due quarterly. Although the policy is named "Flexible Premium Adjustable Life Insurance" policy, nowhere is "flexible" explained. The only place "flexible" is mentioned is where it is noted the *insured* can change the *frequency* or the *amount* of the premiums. In another section, the policy states it is *possible* coverage will expire "where either no premiums are paid following payment of the insured premium or subsequent premiums are insufficient to continue coverage to such date." This could easily be construed to mean that coverage will only lapse if the quarterly payment was not made since this language is located after the "scheduled" premium.

Another section of the policy titled "Continuation of Coverage" provides if the premiums are not made "as planned" the coverage will lapse unless "cash value less policy debt covers the monthly deduction." Again, this concept is not explained. This vague, confusing statement is all that purports to explain when and/or how coverage could lapse. The Barbours were assured the premiums would only be temporary and would cease at some point in the future when there was enough cash value from interest payments to carry the costs of the policy[9]. This never happened and because the premiums continued to be charged, the Barbours had to reduce their premiums and consequently their coverage. This was allegedly never explained as something the Barbours would have to do to ensure the continuation of coverage.

■ Over all, the policy is profoundly vague. Under the summary judgment standards this Court must apply, Defendants have far exceeded their burden to establish material issues of fact precluding judgment for GE. The Barbours paid over $77,000 in premiums and only received $25,076 upon Robert's death because the policy did not in fact "carry itself" as promised. Even considering the $18,000 loan from the policy, there is still a material issue of fact regarding whether the policy was fraudulent as written and whether GE defrauded the Barbours when the policy was purchased.

■ Contrary to GE's argument, waiver and estoppel do not apply to bar Defendants' claims. Clearly the Defendants did not ratify or affirm the contract in question *with knowledge of the fraud* thereby showing their intention to abide by the contract. *Touche, Inc. v. Dearborn,* 161 Ga.App. 188, 291 S.E.2d 35, 38 (1982). Further, they did not waive the cause of action for fraud. The "question as to whether the defrauded party has waived the fraud is one mainly of intent." *Id.* The issue of intent is a question more appropriately submitted to a jury and not adjudicated on summary judgment.

■ Likewise, GE's argument that Ms. Barbour should rescind the policy and return any benefit obtained therefrom is equally without merit. It would be extremely inequitable and unreasonable at this point to require Ms. Barbour to return the money paid ten years ago because the record indicates she was due every penny of that money and possibly more. Because Defendants have submitted sufficient evidence to create material issues of

---

9. *Id.* at 82, 117.

fact in dispute, **Summary Judgment** is **denied** as to the Fraud and Concealment claims.

### C. Georgia RICO Claims

Because the issue of whether GE committed fraud must be submitted to a jury, there is no basis upon which to decide the RICO claims. RICO claims cannot be adjudicated without a finding of fraud that could serve as a predicate act under Georgia RICO laws. *See Prince Heaton Enters., Inc. v. Buffalo's Franchise Concepts, Inc.,* 117 F.Supp.2d 1357, 1362 (N.D.Ga. 2000). Accordingly, **Summary Judgment** is **denied** as to the RICO claims.

### VI. Conclusion

For these reasons, Plaintiff's Motion for Summary Judgment on Defendants' Counterclaim is DENIED. Defendants' Motion for Summary Judgment is DENIED as to their claim attacking this Court's jurisdiction to consider the Declaratory Judgment action and MOOT to the extent it has already been adjudicated in the Order denying the joinder of Ralph Smith.